# In The Matter Of:

*CALIFORNIA PALMS ADDICTION RECOVERY CAMPUS, INC.*

---

*341 MEETING*
*March 10, 2022*

---

*LEGAL ELECTRONIC RECORDING, INC.*
*216-881-8000*
*www.lerinc.com*

Original File 100262.prn
**Min-U-Script® with Word Index**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO (YOUNGSTOWN)

```
                            *
  IN RE:                    *   Case No. 22-40065-jpg
                            *
  CALIFORNIA PALMS ADDICTION *  March 10, 2022
  RECOVERY CAMPUS, INC.      *
* * * * * * * * * * * * * * *
```

TRANSCRIPT OF 341 MEETING OF CREDITORS
HELD BEFORE LAUREN SCHOENEWALD, ESQ.
and KATE M. BRADLEY, ESQ.
REPRESENTING THE UNITED STATES TRUSTEE


APPEARANCES:


JAMES A. VITULLO, ESQ.
For the Debtor

JOHN WEAVER
For the United States Trustee

FREDERIC P. SCHWIEG, ESQ.
Subchapter V Trustee

ALLYSON CADY, ESQ.
For Pender Capital Asset Based Lending Fund


Transcribed by:
- - - - - - - - - - - - - -
Legal Electronic Recording, Inc.
5230 St. Clair Avenue
Cleveland, Ohio  44103
(216) 881-8000  Fax 881-DEPO (3376)


Proceeding recorded by electronic sound recording,
transcript produced by transcription service.
Job No. 100262

1          MS. SCHOENEWALD:  We're here for the first

2    meeting of creditors in the Chapter 11 case of

3    California Palms Addiction Recovery Campus, Inc., filed

4    on January 30, 2022, in the United States Bankruptcy

5    Court for the Northern District of Ohio, and pending

6    before Judge John P. Gustafson.

7          This meeting of creditors is being conducted

8    by the United States Trustee, pursuant to Bankruptcy

9    Code Section 341(a).  The United States Trustee for

10   this region, Region 9, is Andrew Vara.  My name is

11   Lauren Schoenewald, and I'm a trial attorney with the

12   Office of the United States Trustee.

13         With me in my office is also Kate Bradley,

14   who is also a trial attorney with the Office of the

15   United States Trustee, and is assigned to this case.

16   And on the call, as well, is John Weaver, who is a

17   bankruptcy analyst with the Office of the United States

18   Trustee, and is also assigned to this case.

19         Today I will examine the Debtor as to the

20   financial affairs and other matters which concern the

21   administration of this case.  When I have concluded my

22   examination, creditors and other parties-in-interest

23   will have an opportunity to ask questions.

24         Today is March 10, 2022, at 10:00 a.m., and

25   we are conducting this meeting telephonically due to

3

1   the in-person restrictions imposed by the COVID-19

2   outbreak.  This meeting is being recorded

3   electronically.

4          If Debtor's counsel could please first

5   introduce himself and the witness, I will then ask if

6   anyone else is on the phone.

7          MR. VITULLO:  My name is Jim Vitullo.  I am

8   counsel for the Debtor.  My application is pending, and

9   my client, Sebastian Rucci, the representative, is on

10  the phone with us.

11         MS. SCHOENEWALD:  Thank you.  And now if I

12  could get everyone else present on the phone, starting

13  with the Subchapter V Trustee.

14         MR. SCHWIEG:  Fred Schwieg, Subchapter V

15  Trustee.

16         MS. SCHOENEWALD:  And any other parties

17  please introduce yourself and who you represent.

18         MS. CADY:  Allyson Cady on behalf of Pender

19  Capital Asset Based Lending Fund.

20         MS. SCHOENEWALD:  Thank you.  Anyone else on

21  the line that has not been introduced?

22         Okay.  Then after my examination I will allow

23  the Subchapter V Trustee and Ms. Cady to ask questions

24  at that point.

25         Mr. Rucci, if you could please raise your

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 4 of 91

1  right hand to be sworn in, and please let me know when

2  you've done so.

3            MR. RUCCI:  I have.

4              SEBASTIAN RUCCI, WITNESS, SWORN

5            MS. SCHOENEWALD:  Thank you.  You can put

6  your hand down.

7                EXAMINATION OF SEBASTIAN RUCCI

8  BY MS. SCHOENEWALD:

9  Q    Could you please start by providing us with your

10  full name?

11  A    Sure.  Sebastian, S-E-B-A-S-T-I-A-N, last name

12  is Rucci, R-U-C-C-I, and I don't have a middle name.

13  Q    And what is your title with the Debtor?

14  A    I'm the President, the CEO, sole shareholder.

15  Q    And how long have you held this position?

16  A    Since it was incorporated, which would be

17  approximately five years ago.

18  Q    So in 2017?

19  A    Yes, ma'am.  I believe it would be either

20  February or March of 2017.  It started operational

21  February 1st of 2017, and some period or day that

22  month, it was incorporated as a corporation.  I believe

23  it's a C.  I don't think it's an S, that I recall.

24  Q    And what positions did you have prior to this

25  current position?

1  A     Meaning like in other things, or like my history

2  of work?

3  Q     Yes, outside of the Debtor.

4  Q     So the Debtor's connection with other things

5  that I held was we had a company, which was running a

6  hotel, at this same place, and I held the same thing

7  there, President, CEO, managing that company.

8        And then prior to that -- do you want me to go

9  back a little bit in my history of work or that's good

10 enough?

11 Q     No, that's okay.  That's good enough.  Thank

12 you.  So did your counsel provide you with a copy of

13 the petition and schedules?

14 A     Yes, ma'am, and I have it in front of me.

15 Q     Okay, great.  I'm going to need you to verify

16 your signature on the petition, schedules and Statement

17 of Financial Affairs.

18 A     Yes, ma'am.

19 Q     And did you also receive a copy of the

20 Declaration Regarding Electronic Filing?

21 A     I did.

22 Q     Can you please confirm that your signature is on

23 the bankruptcy petition, schedules and Statement of

24 Financial Affairs?

25 A     I see it, it is.

1  Q     And can you please confirm that is your

2  signature on the Declaration Regarding Electronic

3  Filing?

4  A     Yes, ma'am, that's also my -- yes.

5  Q     Can you confirm that you authorized counsel to

6  indicate your electronic signature on the petition,

7  schedules and Statement of Financial Affairs?

8  A     I can.  I believe actually those were actually

9  signed, but yes, he had authorization electronically

10  also.

11  Q     And the same for the Declaration Regarding

12  Electronic Filing?

13  A     Yes, ma'am.

14  Q     And who provided the documents and information

15  that your counsel used to prepare the petition,

16  schedules and Statement of Financial Affairs?

17  A     I did.

18  Q     And did you personally review the petition,

19  schedules and Statement of Financial Affairs before you

20  signed them, and before they were filed?

21  A     Yes, I did.

22  Q     Were you aware that these documents were filed

23  under penalty of perjury?

24  A     I am.

25  Q     To the best of your knowledge, do these

1  documents fully and accurately reflect all the Debtor's

2  assets and liabilities?

3  A     I believe they do.  I believe they do, yes.

4  Q     Since filing have you discovered any errors or

5  omissions to the petition, schedules or Statement of

6  Financial Affairs that require amendment at this time?

7  A     Well, there's two things that are probably

8  updates.  I don't know if I'm answering this correctly,

9  but one is that we filed a claim for the seized assets,

10 to keep that together, and then obviously there has to

11 also be an amendment with regards to opening up the DIP

12 account.  Those are two things that are pending, which

13 I've been trying to do, the second one, for some time.

14 And I have an appointment tomorrow at KeyBank, and

15 hopefully I can get that wrapped up.

16 Q     Okay.  When was the claim filed for the seized

17 assets?

18 A     That was on February 23rd of 2022.  That was the

19 deadline.  So that's Docket Number 6, in that case.

20 Q     And where was that filed?

21 A     So the Northern District of Ohio.  That's before

22 Judge Adams, and I think I have the case number, if

23 you'd like.  Would you like that?

24 Q     Yes, please.

25 A     Sure.  Give me one second, please.  That would

22-40065-jpg    Doc 69-1    FILED 03/14/22    ENTERED 03/14/22 16:35:04    Page 8 of 91

1  be Case Number 22-CV0057.

2  Q    Thank you.  Just give me one moment.

3  A    Sure.

4  Q    What is your current salary with the Debtor?

5  A    I have none right now.  What I used to receive

6  was -- I believe it was $800 a week, and that had been

7  for some time.

8  Q    Eight hundred per week, you said?

9  A    Yes, ma'am.

10  Q    When did you stop receiving that $800 per week?

11  A    Well, that was when the government seized our

12  funds on October 5th.

13  Q    So are you fully paid up for all pre-petition

14  salary, from your perspective?

15  A    Yes, ma'am, I was.

16  Q    And you have not been paid your salary since the

17  bankruptcy filing?

18  A    Correct.

19  Q    Could you please describe your duties in your

20  current position with the Debtor?

21  A    Well, the -- all of it unfolds into about three

22  items that really takes my time.  The one that is the

23  most substantial is the federal forfeiture because it

24  inlocks perhaps all the others.  So my present duty

25  right now is to make certain that, number one, which is

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 9 of 91

1  going to be probably filed today, in some parts of it,

2  is that we start to inform the Court as to the

3  foundation of this forfeiture.

4      And the foundation of this forfeiture, which has

5  already been updated to the Bankruptcy Court very

6  recently, is actually the agency that revoked the

7  license.  And so -- and I hope you don't mind if I go a

8  little bit lengthy here.

9      So the agency revoked the license mainly two

10  years ago, because it had decided it didn't want to

11  come out to re-inspect corrections that we made.  State

12  law requires them to do that.  Other things had

13  occurred there.  We could not convince them to come out

14  and re-inspect or allow what's called a plan of

15  correction.  We then proceeded to an administrative

16  hearing, where numerous issues occurred there.  Again,

17  no plan of correction and no inspections.  Also we were

18  not allowed witnesses, and some other things.

19      What I didn't know then was that the state

20  agency that was doing these things was also involved in

21  this upcoming forfeiture.  So when the state agency

22  released their findings, which is an adjudication

23  order, it was what is the product that was used for the

24  seizure two days later.  So this was all coordinated,

25  which we found out now.

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 10 of 91

1        What occurred after October 5th was we were not

2   able to get a copy of the affidavit that was used for

3   probable cause, to get that document, obviously for

4   many reasons.  That document doesn't support any

5   healthcare findings or any money issues.

6        We did force the hand, and how we did that was

7   we filed suit against the government.  It's what's

8   called a 41(g) motion, basically to get the money

9   returned.  41(g) motions can be trumped by a civil

10  forfeiture filing, which we forced the government to

11  do, which they did in January.

12       The civil forfeiture filing, as will be shown in

13  some of these documents coming up in our responses,

14  also is identical to the issues of the deficiencies

15  that they found two years earlier.  So we now can prove

16  that the whole case is based on these clinical issues,

17  which have nothing to do with billing, and that this is

18  the foundation of this seizure, this forfeiture, and

19  the revocation.

20       What the documents will also show you is that

21  the company that is here, based on our philosophies

22  that was from inception, actually was very generous to

23  the Medicaid public.  We actually provided about 50

24  percent of our care for free.

25       So the place was closed without a hearing,

1  without notice, through a seizure process that actually

2  required notice and hearing, with this agency behind

3  it, with two-year-old deficiencies, and that's the

4  basis of the government's case.

5      I believe that once we can show that through the

6  Court, force the government's hand to actually respond

7  to it, then what that will do is that will also open up

8  the possibility of us going back in to get our license,

9  which we legitimately have a right to.  Medicaid's will

10  reverse right away, because there's was only based on

11  that.

12      So what our whole plan is is to do that.  It's

13  been a long five months of trying to get these

14  documents, and we actually had to do it in reverse.  So

15  the one document that will come across, for example,

16  will show you 25 sentences in the forfeiture case which

17  match exactly to the findings of OhioMHAS two years

18  ago.

19      And so what I'm doing is spending a majority of

20  my time on that, because I believe that once that is

21  exposed, including the fact that this company was very

22  generous to the Medicaid public, I think it will be

23  very difficult for other people to stand behind what

24  they ran, and so, you know, that's been the road.

25  Unfortunately, if proper federal procedures would have

1  been followed and the affidavits released, or hearings

2  held, we would have had this, but for obviously

3  reasons, nobody wanted us to know that.

4       So, that's been really what I do almost about 18

5  hours every day, to try to put that together.  That's

6  coming close now, and it will be released.  And then I

7  believe at that point, Judge Adams, I'm anticipating

8  within about three weeks, will hold hearings on that.

9  And I'm anticipating people will want to sit down and

10  clean up the mess that was created.  So I hope that

11  answered it.

12  Q     Thank you.  In terms of your duties pre-October

13  of 2021, what did your duties entail then?

14  A     We had -- we had a very successful company.  We

15  were growing.  So my duties were obviously managing the

16  oversight of what was about 50 employees.  We had an MD

17  We had a PhD.  We had about seven with master's

18  degrees, and it was quite a few different goals that

19  were here.  We also had about 110 clients at the time,

20  which makes us about number one or number two in size

21  in the state.  So I did that.

22       We also at that time we were, you know, trying

23  to control getting a new loan, which is still on hold,

24  to solve our loan with Pender.  We were also looking to

25  grow.  We were -- we were looking to expand on the

1  second facility.  We were actually looking at a third

2  one at that time.

3       So there was a lot of -- a lot of management.

4  The industry that is in, because I'm also on site, you

5  have a lot of individuals that you're dealing with, but

6  at that point it was flowing pretty well.  We had been

7  open almost about 26 months, with revenues, and it was

8  flowing pretty well at that point.

9  Q    Okay.  Are you a creditor of the Debtor?

10 A    You know, I don't think I'm a creditor.  I know

11 that as an equity shareholder under Subchapter V, I

12 know I have rights, but I believe I'm just an equity

13 shareholder, which is what's left once everything else

14 is cleaned up, if I said that correctly.

15 Q    And you're the 100 percent shareholder of the

16 Debtor?

17 A    Yes, ma'am.

18 Q    And have you ever taken loans from the Debtor?

19 Are you indebted to the Debtor in any way?

20 A    No, and that's not the relationship we have.

21 Q    Have you ever lent money to the Debtor?

22 A    I'm quite certain through time, but it's not --

23 to me it was always, you know, we're building the

24 company.  So it doesn't owe me anything and I'm certain

25 I have over five years.

1  Q     So your testimony is that you have lent the

2  Debtor money but it does not owe you anything at this

3  point?

4  A     Yes, ma'am.

5  Q     Does the Debtor have any claims against you that

6  you're aware of?

7  A     No, I'm not aware of any.  No, I don't think so.

8  Q     And have you personally guaranteed any debts of

9  the Debtor at any time?

10 A     Just like Pender's loan with my other company, I

11 guaranteed it.  I don't think there's anything here

12 with this one, but I'm sure whenever we were

13 proceeding, if it was required, I always did, but I

14 can't think of anything right now.

15 Q     So you in your personal capacity guaranteed

16 Pender's loan, or you're saying your other company

17 guaranteed Pender's loan?

18 A     I personally did also.  The company did and then

19 I -- I guaranteed it.

20 Q     And what other company personally guaranteed it?

21 A     Well, that was actually the one that took out

22 the loan, so that was California Palms, LLC, that was

23 the borrower, and then I was the guarantor.

24 Q     Okay, thanks.

25 A     And when we were proceeding with the loan for

1  this one, it was the same thing, I was the guarantor

2  usually.  The company would have been the borrower.

3  Q     When you say for this one, what do you mean?

4  A     Well, we were -- we were looking to get a loan

5  to take out Pender for -- to pay them, to move them on,

6  and that's what -- at the time when this occurred, we

7  had been working on a loan, and it's still on hold

8  though.  So there was numerous ones I've been working

9  on, but one of them is still viable, depending on what

10 happens with the bankruptcy.

11 Q     But there has not been any loan taken out at

12 this time?

13 A     Yes, ma'am, that's correct.

14 Q     Are there currently any other officers or

15 employees of the Debtor?

16 A     No.  If I may just expand on that, the

17 healthcare industry, the way we are here, we were very

18 charitable to many people, so I have a lot of

19 volunteers right now that are hanging on, waiting to

20 see what occurs.

21 Q     When you say volunteers, what sorts of

22 activities are they doing?

23 A     Well, it's kind of the same thing as before so,

24 for example, some of them, if they were former clients

25 that would stick around, then they would assist in

1  different ways.  So right now some of the volunteers

2  are helping basically making sure that this building is

3  secure, the other building is secure, and that, you

4  know, if we finally get our hearing, to get things

5  reversed, we'll have facilities to -- to reopen up to.

6  Q    Are they providing any medical services at this

7  time?

8  A    Providing?  No, ma'am.  They're not at that

9  capacity.

10  BY MS. BRADLEY:

11  Q    And are the volunteers, are those comprised to

12  some extent of former employees of the Debtor?

13  A    Yeah, that would probably be correct.  Probably

14  some are former clients, some are not former clients,

15  that stuck around, but they're not obligated to do

16  anything.  They volunteer, they volunteer.

17       Like, for example, we still have somebody that

18  mans our door, so there's still 24/7 security here,

19  things like that.

20  Q    They're not getting paid in any capacity?

21  A    That's correct.

22  Q    And when I'm asking, I don't just mean by the

23  Debtor.  I mean, are they being paid by you personally

24  or by any of your affiliated companies?

25  A    They're not.  They're just hanging on.

1   Q      Okay.

2   BY MS. SCHOENEWALD:

3   Q      How many people are at the Austintown location

4   volunteering?

5   A      Anthony and Tom -- total, there might be about

6   ten.  They have their own jobs.  They go to work.  You

7   know, they stay here.  Some are going for clinical

8   care.  They do all of that.  That's all continuing on

9   their own.

10  Q      They're going to other facilities for clinical

11  care?

12  A      Yes, ma'am.  There's one called On-Demand,

13  that's near us, and quite a few are going to that one.

14  Q      Okay.  How many employees did the Debtor have

15  pre-petition?  So I guess --

16  A      I don't know if it's an exact number, but it was

17  about 50.

18  Q      So that would be pre-October of 2021?

19  A      Yes, ma'am.

20  Q      And are you the only director currently?

21  A      Yes.

22  Q      Pre-October 2021, how many directors were there?

23  A      It's only been me forever.

24  Q      And are any of the current volunteers or prior

25  employees creditors of the Debtor?

1   A      No, they're not.

2   Q      Are any of the current volunteers or employees

3   indebted to the Debtor in any way?

4   A      No, they're not.

5   Q      Have any of them made any loans to the Debtor?

6   A      No, they have not.

7   Q      And does the Debtor have any claims against them

8   that you are aware of?

9   A      No, I'm not aware of any and I don't believe

10  they do.

11  Q      And have any of the former employees or current

12  volunteers personally guaranteed any debts of the

13  Debtor?

14  A      No, they have not.  That I know for sure.

15  Q      Is the Debtor currently using any independent

16  contractors, consultants or temporary employees, other

17  than the volunteers we just discussed?

18  A      That and counsel, that's it.

19  Q      And you said the Debtor was formed in 2017.

20  Where is the Debtor incorporated?

21  A      Ohio.

22  Q      Is the Debtor in good standing with the State of

23  Ohio?

24  A      Yes.

25  Q      You've touched on it, I believe, but why did the

22-40065-jpg    Doc 69-1    FILED 03/14/22    ENTERED 03/14/22 16:35:04    Page 19 of 91

1   Debtor file bankruptcy?

2   A       Obviously, there was one pending emergency,

3   which was the issue that Pender was going to hoist us

4   out the door.  As probably some of the filings have

5   shown, it's not quite what was presented, so my story

6   would go like this, as to what I believe.  We had a --

7   prior to October we had a very viable company that was

8   doing a lot of public good, and it was actually doing

9   well economically.  It did things a little bit

10  different.  Like I said, it had a lot of free care

11  provided, but it still made money and it was looking to

12  expand.

13          In October -- in August, there was a

14  longstanding dispute with Pender.  We had succeeded at

15  every level in the case, for a usury case against

16  Pender, where we had alleged that their settlement

17  agreements actually increased the debt due and they

18  were done under duress.  We had prevailed on judgment

19  on the pleadings.  We had prevailed on summary

20  judgment, and we were at trial.

21          I had wanted an opportunity to settle up with

22  Pender and get them paid, so I approached them earlier

23  that day.  This was scheduled for a one-day bench

24  trial.

25          There's a long history of not going well with

1  trying to get things done with Pender, and I don't mean

2  this in a bad way, but it's just very difficult because

3  you're trying to get a substantial loan and you need

4  some time.

5       Anyways, the morning, that didn't go well.  I

6  took the stand.  I thought we did really well.  I

7  thought they did well on cross-examinations.  We went

8  to lunch, and then I pressed them again to try to

9  settle.  Ultimately, we did agree.  And again I point

10  that out, because we had appeals that were pending at

11  that time.  They had substantial claims that were

12  there.

13       For example, the foreclosure occurred in the

14  height of COVID.  There was really no advertising that

15  was available, no findings that were made, in final

16  order, so I believed we could do well there.

17       So there was issues that were still pending.  So

18  what we ultimately agreed to is we gave up all those

19  rights and dismissed all those, which we actually did

20  enter late August.  We then agreed to wire 500,000 to

21  Pender, which we did, actually the following Monday,

22  once I realized that we needed more time for the loan,

23  because everything moved very, very quick.  We did it

24  all on the record, within like a half hour.  By the

25  time I was able to reach any of the financing people,

22-40065-jpg    Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 21 of 91

1  they were like, we're not available.

2        So by Monday, which is only one business day

3  away, we worked it out to get some additional time that

4  was needed to get the financing done.  It was done by

5  agreement with the attorneys, and the emails, which I

6  had.

7        So at that point we proceeded forward.  So, A,

8  the company is doing well at that point.  It's running

9  itself pretty well.  It has its own drug dog.  It has

10 about 50 people that are here, has multiple directors,

11 medical staff, et cetera.

12       We were aware -- I was aware of the issues with

13 the state agency and the licensing.  That had been

14 going on for about roughly almost a year and a half by

15 then.  I was also aware of the violations that were

16 there, and I knew we could handle that on a stay, when

17 it proceeded on the appeal.  So that wasn't anything --

18 I mean, I would have liked it to have been better, but

19 it is what it is.  It wasn't anything that was

20 destructive.  We were moving forward and we were

21 actually looking to expand possibly to a third site.

22       So by the time we get to October, the first week

23 in October, you know, then everything kind of collapses

24 after the 5th.  Your funds are seized.  Your agency,

25 now, you had -- at that time you had 30 days to file

22-40065-jpg    Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 22 of 91

1  for a stay, and also an appeal of that, administrative

2  appeal, which is pending.  We did file it.  And then

3  also try to undo what had occurred here by reviewing

4  these warrants, because I knew then, as I know now, we

5  weren't involved in anything that was defective.

6       So when that progressed from there, we then

7  obviously -- what was used was the cry of the federal

8  investigation.  And the next thing I know, we actually

9  don't get the stay, which was really odd, because I

10  think it was a sure thing under law.  But so be it.

11       Then at that point our efforts were to try to

12  put things together.  So I continued with efforts on

13  the loan at that time, which was much more difficult

14  now with obviously the license issues, but I convinced

15  them that we can undo that, and that's the position

16  they're at today.  So that progressed ahead.

17       Then, of course, within a short period I had

18  Pender moving to evict us.  Now, the problem with that

19  in my view, which is part of the record, is that the

20  agreement we had in October provided -- excuse me, in

21  August, was that we would get documentation, so we

22  could actually get this loan done.

23       That actually wasn't given to me until I think

24  it was the 16th of October, past when all this other

25  stuff had occurred, and there was no reason for that.

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 23 of 91

1  Our agreement in court was that it would happen that

2  day.  So that presented some problems in trying to get

3  financing, because by then I had, you know, the federal

4  authorities, the state authorities and all that, so I

5  could have had that wrapped up.  But that didn't

6  happen, so then I had that struggle.

7       Mind you, the eviction that occurred at the end

8  of October was occurred by a consent judgment that was

9  based on what we consented to in August.  I believe

10 there was a breach, but there was no real time to put

11 that together.  So by that point I had to just struggle

12 with what it was, to try to still get the loan put

13 together in the midst of all those things that we had.

14      When we got to filing on the 30th, there was

15 multiple reasons that I believe this entity can put

16 things back together.  It doesn't have a lot of debt.

17 It actually paid its bills pretty well.  And I believe

18 that the federal forfeiture seizure is completely

19 bogus.  It's tied towards MHAS, and MHAS is completely

20 bogus.  They had a right to give us a plan of

21 correction, which they knew I would consent to and

22 comply with, and they didn't do it strategically

23 because of all these reasons.

24      So when it came to that, we were holding off

25 with also was in front of me was a facially defective

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 24 of 91

1  warrant that was signed by the clerk, not the judge,
2  and we had all these other issues.
3      Ultimately our view is why we filed, A, I want
4  to get Pender paid and I believe I can.  B, I needed
5  some time because of that to get these things in front
6  of a court, so I can show them what information we had.
7  The government, unfortunately, kept hiding that, so we
8  had to use this backward method of putting that
9  together.  And then once I had all that was to go
10 forward against MHAS and get that license back.
11     So those three things, I believe, can happen,
12 including getting Pender paid, and so that's why we
13 filed.  It wasn't just to prevent an eviction for one
14 issue.  We actually had a viable plan, and that's
15 there.
16     Now, I get that it looks really odd.  I mean,
17 you've got the government that's over here, says hey,
18 we're seizing, this is a healthcare fraud.  You've got
19 some agency here that says, oh, we're going to take
20 your license, and we're going to do that.  I know how
21 that looks, but your best evidence is to look also at
22 the letter from Medicaid.
23 Q    Mr. Rucci, I'm sorry to cut you off, but just
24 for the sake of time, I think that you've answered that
25 question, but I did just want to move on.  So unless

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 25 of 91

1  you have a short finish, let's move on to other

2  questions.

3  A    The last thing I was going to finish with is

4  that -- and I apologize for that, is that if you look

5  at the Medicaid letter you can see that you're still

6  allowed to bill after the seizure.  That's just unheard

7  of.  So the point is, we have, and I have, personally a

8  belief that we can get something done.  Unfortunately,

9  it's taking time to get there.

10  Q    Okay.  Mr. -- I'm sorry to cut you off again,

11  but we just for sake of time, we need to move on.

12  A    Sorry.  My apologies.

13  Q    That's okay.  So I understand the reasons why,

14  but when did the Debtor decide to file?  Do you know

15  what date?

16  A    Well, the possibility of a bankruptcy was looked

17  at for a few -- for a few weeks before then.

18  Q    Okay.

19  A    Something that had been kicking around

20  potentially.  So --

21  Q    Okay.

22  A    -- it was actually looked at, you know, five,

23  six weeks.  The problem I had just before we answer

24  your question is that once all this -- articles came

25  out, it was very difficult to get any support.

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 26 of 91

1    Everybody looked at you like you were a criminal.

2    Q    Yeah.

3    A    That presented a lot of problems.

4    Q    Okay.  And you ultimately made a decision to

5    file?

6    A    I did, yes, ma'am.

7    Q    Has this Debtor had any prior bankruptcies?

8    A    It has not.

9    Q    And have any affiliates of the Debtor ever filed

10    for bankruptcy?

11    A    I don't know if you would call the former LLC,

12    the landlord, an affiliate, but if it's an affiliate,

13    it did twice.  If it's not an affiliate, then it

14    didn't, but I don't know how you would look at that.

15    Q    And you're talking about California Palms, LLC?

16    A    Yes, I am.  They didn't own each other, if

17    that's what it is, but obviously they're affiliated

18    through me, so --

19    Q    Okay.  So do you have any interest in California

20    Palms, LLC?

21    A    It's same like this one, I own the whole thing.

22    Q    Okay.  And do you or, if you're married, your

23    spouse have any other interest in any other business?

24    A    I'm not married, divorced.  I was married about

25    32 years.  Do I have any interest in any other

1  businesses?

2  Q    Yes.

3  A    Let me think.  I had corporations from the past,

4  like Rucci Development.  A lot of them have been

5  dormant.  My focus for the past five years has been

6  this business.

7  Q    Are any other businesses that you have an

8  interest in still operating or have been operating in

9  the past say five years?

10 A    No.  This has been my sole focus.

11 Q    So this and California Palms, LLC?

12 A    Correct.

13 Q    Has the Debtor used any other names, other than

14 the one listed on the petition?

15 A    Just that.

16 Q    And please give me a short summary of what the

17 nature of the Debtor's business is, what services have

18 been provided historically.

19 A    Sure.  So the Debtor's business is substance

20 abuse and mental health treatment.  So what that does

21 is a person who has been abusing or has the unfortunate

22 part of the affliction of either drugs or alcohol, we

23 treat that.  And how we treat that is there's various

24 spectrums in the levels of care, called ASAM.

25       And they can come to us at a very early level

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 28 of 91

1  like, for example, they had just used heroin, per se,
2  they would get then detoxed for a short period, and
3  then from there, they would step down the various
4  levels, as they started to get better.
5      The principal thing that you do is a couple
6  things.  Number one is we provide the housing, because
7  we do the residential portion.  We provide the food for
8  them, that part, and then also obviously we provide a
9  lot of clinical care, and then other care.
10     The clinical care is composed of -- actually,
11  it's technically lower level people called CDCAs,
12  they're assistants.  And then they're supervised by
13  supervisors, most of which would have master's degrees
14  and on.  We also had an onsite nursing park, which we
15  had RNs and LPNs, and then we had an MD that came in
16  twice a week.
17     And so your role there is to work with these
18  people that come to you in a very difficult state of
19  use, and then you can to try to step it down.  And what
20  we did is we kept stepping it down, and because we had
21  this amazing facility, we could go longer term care
22  than other places normally do.
23  Q    Okay.  So in terms of medical professionals you
24  had on staff, you had nurses, LPNs and MDs?
25  A    Yes, and they're only needed for the detox.

1  They're not really needed for a majority of what you

2  do.

3  Q    So how often were they on site, how many days

4  per week?

5  A    Well, nursing we had 24/7.

6  Q    Okay.

7  A    Medical was twice a week, and then he was

8  available by phone at any other time.

9  Q    You mean the one doctor?  You only had one

10  doctor?

11  A    Yes, ma'am, just one doctor.  So he would -- he

12  would come in twice a week.  It was Tuesday and Friday,

13  but he was also available throughout the week, if we

14  had anything that went on for him.

15  Q    Okay.  So the Debtor was incorporated in 2017.

16  When did it start operating?

17  A    2017.

18  Q    I mean, do you know, like immediately?  Did it

19  have any time between incorporation and starting to

20  operate?

21  A    It actually started operating February 1st.

22  Actually, about five weeks before it was incorporated.

23  Q    Okay.

24  A    It didn't really do anything at that time.  It

25  was just working on the licensing

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 30 of 91

1 Q      Okay.  Where are the Debtor's files located

2 currently?

3 A      Some are on computers, some are in the cloud,

4 and basically quite a bit is stored on computers.  So

5 the clinical files is what's called BestNotes.  That's

6 available on the cloud, if you will, through a service.

7 And then its billing files is -- I forget the name for

8 that one.  There's a name for that too.  That's

9 available.  And then, of course, we have Business

10 Dropbox for a lot of the other files, you know, like

11 our forms and other things like that.

12 Q      Are those files secured, meaning who has access

13 to them?

14 A      Correct, you would need the password and et

15 cetera, et cetera, yes, they're secured.

16 Q      Who has that password?

17 A      Well, different people from the past would have

18 it.  Obviously, I have it.  And then we also have

19 master control to take people off, which we do when

20 they're not here.

21 Q      So who currently has access, just you or other

22 people, as well?

23 A      There's a couple things out there.  So there's

24 Best Notes and then there's Dropbox, et cetera.  And so

25 there would be different people that are helping, you

1  know, collect this data that would have access to it.

2  Q    So for Best Notes, who has access to that right

3  now, as of today?

4  A    I would have access to it.  Jamie Dattilio, my

5  fiancee, would have access to it.  I don't know who

6  else from that point, because we basically suspend a

7  lot of the others.

8  BY MS. BRADLEY:

9  Q    Does your fiancee -- was she an employee of the

10  Debtor?

11  A    No.  No, she just -- she just helps out.  She's

12  familiar with a lot of that stuff, so she helps me

13  collect some of this data, with what we were doing.

14  Q    And that data, are those --

15  A    The --

16  Q    I'm sorry.  Is that data, does that include

17  medical records, patient information?

18  A    Yes.  Yeah, it would have patient information,

19  billing records, things like that, yes.  Everybody that

20  was here, even if you volunteered, they all signed

21  waivers, and so we have all those.

22  BY MS. SCHOENEWALD:

23  Q    Does the Debtor have any physical files?

24  A    I'm sure there's some left.  The FBI took quite

25  a few boxes on October 5th.  I don't know what's left.

1   I'm sure there's some left.  But we -- we principally

2   operated electronically, so a lot of it is principally

3   there.

4   Q    If there are any left, where would they be

5   located?

6   A    Well, we have an office downstairs, which has

7   about five different desks, so there would be some

8   there, potentially some in the nursing office.

9   Q    So at the Austintown location is where they

10  would all be?

11  A    Yes, yes.

12  Q    Would they be in a locked cabinet or drawer or

13  anything, or no?

14  A    Yes.  For example, all of them have -- have

15  their own locks, like, for example, the nurse's office

16  is locked up.  My own desk would be locked up, et

17  cetera, yes.

18  Q    And who has access to the keys to those rooms

19  where they'd be located?

20  A    I would.

21  Q    Only you, exclusively you?

22  A    Well, when the nurses were here, they had them

23  but, you know, they turned in their master keys, et

24  cetera, when they left.

25  Q    So as of today, only you would have access to

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 33 of 91

1  those rooms where the files could be, if they still

2  exist?

3  A     Correct.

4  Q     So just as a quick summary, the last day that

5  the Debtor was operating was October, before the FBI

6  raid, correct?

7  A     The -- the last day that it actually functioned

8  license-wise, if you will, was, I believe, October

9  29th.

10 Q     Okay.  On the Statement of Financial Affairs,

11 the Debtor indicates it is operating as a sober home.

12 What does this mean, briefly please?

13 A     Well, it's -- I'm sorry, I apologize.  It's like

14 all my statements I've said, where we have some of

15 these people that are here, that are volunteers.  Some

16 of them go to AA meetings.  You know, that's what keeps

17 them sober, and so that's what we're doing, and it's

18 just a label that we can temporarily -- we're basically

19 buying time to get to court, to undo everything that

20 had occurred.

21 Q     So is there any structured activities that make

22 it a sober home, or is it just that people are living

23 there?

24 A     No, actually we do have some.  For example, Sam

25 Naples, one of the former counselors, comes in and just

1  meets with them twice a week for an hour, to see how

2  they're doing.  They have their own activities where

3  they're going to AA meetings externally, but that's --

4  it's very little, but that's about it.  I do have the

5  one guy that comes in and visits with them.

6  Q    And the individuals living there, they're

7  volunteers.  Are they all former patients or are some

8  of them the past medical professionals or former staff

9  members?

10 A    They're going to be some former patients, who

11 either were working for us, with us, prior to the

12 seizure, and some are former staff members that were

13 not patients, that were here already.  I mean, they

14 were actually staying onsite at that time, and who

15 stayed on.

16 Q    Okay.  Are any of these individuals paying rent,

17 utilities, any sort of payments?

18 A    No, I have not asked for it.

19 Q    What was that last part?  I'm sorry.

20 A    I apologize.  No, I have not asked for it, no.

21 Q    Do they have any agreement to be there?  Have

22 they entered into a lease or anything with you -- or

23 the Debtor?  I'm sorry.

24 A    No, I think everything would be pretty much

25 verbal, if you will.

1  Q     Is the Debtor providing them with any food?

2  A     No, they're -- a lot of them are on Medicaid.

3  They have their own -- their own food that they get.

4  Q     And I believe you indicated previously, but just

5  to confirm, have they been paid for any of their work

6  that they're providing?

7            MS. BRADLEY:  The volunteers.

8            THE WITNESS:  No, not at this time.  They're

9  -- some of them were paid before we had this.  Like I

10  said, they're volunteering now just waiting things out

11  to see what happens.

12  BY MS. SCHOENEWALD:

13  Q     So nothing post-petition?

14  A     Yes, thank you.

15  Q     In addition to the $80,000 listed in rent to

16  California Palms, LLC, has there been any other rent

17  due to California Palms post-petition?

18  A     No, that's -- that was actually what was set up.

19  Correct though.

20  Q     I'm sorry, what was that?

21  A     No, it has not, because -- no, the answer would

22  be no.

23  Q     And that $80,000 listed, what time period does

24  that represent?

25  A     That would probably represent some time period

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 36 of 91

1  prior to Pender -- I believe Pender's -- at some period

2  prior to Pender getting the deed for the property, and

3  I don't recall what it was.

4  Q    Was there a written lease agreement between the

5  Debtor and California Palms, LLC?

6  A    Yes, there was.

7  Q    Could you please provide that to your counsel so

8  he could send it to our office?

9  A    Absolutely.

10  Q    And what were the terms of that lease?

11  A    Its -- its lease was 10,000 per month for the

12  first year, and then it went up to 50, and then once

13  different things occurred, it revised it back down.

14  Q    Okay.  What was the date you said the Debtor

15  lost its license?  October 29th, was that correct?

16  A    Yes, and it had the administrative appeal

17  pending.

18  Q    Yes, but --

19  A    October 29th was the date, yes.

20  Q    Okay.  And the Debtor did not operate after

21  losing its license?

22  A    It did not operate as a substance abuse

23  facility, correct.

24  BY MS. BRADLEY:

25  Q    You previously walked through the steps that you

1  have taken, or that the Debtor has taken, to try to

2  have the license reinstated.  How long, if things went

3  the way -- if everything went according to the way that

4  the Debtor believes it would, or it should, how long

5  would that process take?

6  A    My belief is that -- is that once -- to answer

7  your question in a short way, I believe within 60 days,

8  when the information is disclosed that the OhioMHAS

9  revocation, based on two-year-old findings, without a

10  plan of correction, without re-inspection, is the

11  foundation of the seizure, I believe a whole bunch of

12  things will unfold in our favor.

13      I have talked to the State.  I talked to them

14  actually on October 28th, and they said if things

15  change, you can get your license back.  So I believe

16  that people have the power to do this, once this is

17  disclosed, and I believe within 60 days this will

18  happen.

19  Q    And how does the Debtor intend to fund the costs

20  that are associated with the bankruptcy during that 60-

21  day period?  Or longer, to the extent -- it may well

22  take longer, if things don't happen the way you

23  envision them.  How are you going to pay for counsel

24  fees, utilities, insurance, those types of things?

25  A     Sure.  Well, number one, is I expect to get my

1  $600,000 back, like quickly, once this is in front of

2  Judge Adams, so that's number one.  We do have some

3  funds that will get put into the DIP account as soon as

4  I can eventually get somebody to allow me to open one.

5  And so we have some funds.  We don't have forever, but

6  we certainly have enough to last 60 days, so that we

7  can get this in.

8  BY MS. SCHOENEWALD:

9  Q    Who is counsel in that action for the Debtor?

10  A    So James Vitullo has got like the administrative

11  appeal and all that, and then the other one for the

12  Debtor, his name is Steve Albenze, and he's the one

13  representing the Debtor, although I prepare obviously a

14  lot of the work, because they're for both of us.

15  Q    So Mr. Vitullo is counsel for the Debtor in the

16  Ohio Mental Health and Addiction Services action, and

17  Mr. Albenze is for the forfeiture action?

18  A    That's correct.

19  BY MS. BRADLEY:

20  Q    And is Mr. Albenze continuing to do work today

21  on behalf of the Debtor in the forfeiture action?

22  A    He is.  He is.

23  Q    And have you -- I don't think that an

24  application to retain him for the services has been

25  filed.  Do you intend to file one?

1  A    Yes, I just wrote it down.  Yes, ma'am.

2  Q    And has he been paid anything since the case was

3  filed?

4  A    No, not since.  He was paid 10,000 when this

5  started, long ago, when he entered the case.

6  BY MS. SCHOENEWALD:

7  Q    Which was when?

8  A    Let me see.  When we filed the 41(g), so that

9  probably would have been the first part of November.

10  Q    When did the Debtor most recently receive funds

11  from Medicaid?

12  A    I actually have a check in my drawer that's

13  uncashed that I want to put into the DIP, so about

14  three weeks ago, I think.

15  BY MS. BRADLEY:

16  Q    And what did that payment relate to, what time

17  period for services?

18  A    It would have all been prior to October 29th.

19  We haven't billed for anything after that.  We didn't

20  give anything after that.

21  Q    Do you know how much that check is for?

22  A    So -- so if I may, what happens is, you still

23  have one year from your services to still get paid, so

24  there's still plenty of room for that.  I'm sorry, I

25  cut you off again.

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 40 of 91

1  Q      I was just asking how much that check that

2  you're holding is for?

3  A      That last one -- hold on.  I can tell you exact.

4  This one was for Sympatico, it was for $5,314.65.

5  BY MS. SCHOENEWALD:

6  Q      Other than that check, has the Debtor received

7  any money from Medicaid post-petition?

8  A      It has not post-petition, no.

9  Q      How much would you say you have in accounts

10  receivable with Medicaid at this point?  How much does

11  the Debtor have outstanding?

12  A      I would say it's about 200,000.  Part of it is

13  going through all the claims.  And so as we were doing,

14  preparing for this backwards investigation, we still

15  see that we have more claims out there.

16  Q      So on Schedule A/B, on Page 11, if you could

17  turn to that.

18  A      Yes.

19  Q      You -- I'm sorry.  You list $86,000 in accounts

20  receivable.  So does that not represent all of what you

21  have outstanding, what the Debtor has outstanding?

22  A      It's, like I said, when we were doing the work

23  for -- for -- preparing for these different things that

24  we're filing federally, we can see that we still have

25  more claims that we can ask for.  That's why I upped it

1   about a hundred thousand.

2   Q     Okay.  So turning to the Statement of Financial

3   Affairs.

4   A     Yes.

5   Q     The Debtor's revenue for the last three years,

6   you indicate about two million in 2020, and about four

7   million in 2021.  What led to such a drastic increase

8   in revenue?

9   A     We -- so we actually took on more clients.

10  Q     Okay.

11  A     We get about ten to 20 calls a day, so I have

12  plenty of room to fill them.  Unfortunately, I always

13  have things that are disrupting it, for example, the

14  state issues with licensing, which is there, and then a

15  lot of those Pender things.

16  Q     Okay.  And how many beds -- I'm sorry.

17  A     Sorry, go ahead.

18  Q     How many patients was the Debtor able to have,

19  when it was operating?

20  A     We actually are licensed for 200 beds.  We're

21  actually the largest in the state.  We actually make up

22  about five percent of the state's beds.

23  Q     And --

24  A     We never really have --

25  Q     Go ahead.

1  A     We've never really tried to do more than about
2  100 in this facility, about 110.
3  Q     Okay.  And do you know what the Debtor's net
4  income has been the past three years?
5  A     No, I don't know the net.  I'm sorry, I don't
6  know that off the top of my head.
7  Q     That's okay.  When was the Debtor last
8  profitable, what year?
9  A     I would think last year and certainly this year
10 was heading that way.  I think it was profitable.  I
11 don't think it was three years ago.
12 Q     By this year, you mean 2022 or 2021?
13 A     I apologize.  Let me rephrase that.  2020 I
14 think was profitable.  2021 was profitable.  It was not
15 in '19 and certainly is not going to be yet this year.
16 Q     Thank you.  Other than Medicaid does the Debtor
17 have any other outstanding accounts receivable?
18 A     Well, technically, it has claims.
19 Q     Yes, but any --
20 A     We believe either we work something out with
21 Pender or we get the 500,000 coming back.  We have the
22 six hundred plus thousand coming back from the
23 government.  We have some potential claims of damages
24 from different things, so --
25 Q     But there's no other accounts receivable due to

1  the Debtor, aside from Medicaid?

2  A     That's correct.

3  Q     Is there a particularly slow or busy time of the

4  year for the Debtor?

5  A     You mean now if we were operating, or the way we

6  are now?

7  Q     When it was operating.

8  A     This would have been a busy time of the year.

9  Winter, you know -- we always were busy, but -- but

10 around this time of the year, winter, because a lot of

11 the people are homeless, per se, in the addiction

12 community, you would have been much busier.

13 Q     Okay.

14 A     We would have been full.

15 Q     Okay.

16 A     Just as an aside, and I know you're trying to

17 rush.  We still get about ten calls a day.

18 Q     Okay.

19 BY MS. BRADLEY:

20 Q     And does the Debtor have -- I think you've

21 already said no, but does the Debtor currently have any

22 revenue, any money coming in?

23 A     Not -- you mean like coming in directly, no.  We

24 have this DIP account that I need to open up and

25 transfer those other funds.  That hasn't happened.

1    Q    No.   I mean, does the Debtor have any source of

2    revenue outside of the money -- I'm not talking about

3    the money that's sitting in any particular account

4    right now.   I'm talking about any ability to generate

5    new income or revenue since the case was filed.

6    A    I would answer that and say I'm not doing

7    anything, because I'm focusing on the case, but

8    theoretically I have a big building.   You could do all

9    kinds of things with it, you know, if I needed to

10    generate revenues.   You could rent rooms, you could --

11    there's a whole bunch of things that could occur.   I'm

12    not doing that because I believe all this will come

13    very quickly.

14          MS. BRADLEY:   Okay, thank you.

15    BY MS. SCHOENEWALD:

16    Q    What was the total of the Debtor's assets as of

17    the filing date?

18    A    I apologize.   I'm looking at what I put in

19    there.   Whatever was listed in there is what my total

20    was.   The summary of assets is a little over $3

21    million, I believe.

22    Q    Okay.

23    A    3.1.

24    Q    And briefly what are those assets comprised of?

25    A    I apologize.   I'm going to actually go back and

22-40065-jpg    Doc 69-1    FILED 03/14/22    ENTERED 03/14/22 16:35:04    Page 45 of 91

1   -- let's see.  Off the top of my head, I know we have

2   the assets from the federal government.  We have the

3   various claims --

4   Q    Let's do it this way.  Aside from the accounts

5   receivable, the claims you've mentioned, are there any

6   other hard assets, intellectual property, those sorts

7   of things, inventory?

8   A    No.  Well, let's see.  We have our furniture,

9   fixtures and all of that here.  That's about close to a

10  million dollars on that.

11  Q    Okay.

12  A    And our funds, we have --

13  Q    So in terms of the furniture and things of that

14  nature, does the Debtor own those outright, or are

15  there liens and encumbrances on those items?

16  A    No, they own them outright.

17  Q    On Schedule E/F, the Debtor lists Southeastern

18  Equipment Company as a creditor, with a lien on

19  equipment.  What equipment is that lien on?

20  A    That was -- that was some grading work that they

21  did at our Summerfield property.  I'm sorry, I don't

22  know if it's a lien.  It's just a debt that's owed.

23  Q    Okay.  Have there been any appraisals done of

24  the Debtor's property in the last two years?

25  A    Yes, with all these various loans, we've done a

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 46 of 91

1 couple.

2 Q      Okay.  Do you know what the Austintown property

3 was appraised for most recently?

4 A      Yes.  It was from Coldwell Banker CBRE, so the

5 national one.  I think about $9 million, little over.

6 Q      And does the Debtor have a copy of that

7 appraisal?

8 A      It does, and I can give you that.  I also have a

9 second one with the -- the lender that is stay on hold

10 -- I can give you that one also, if you wish, yes.

11 Q      Yes, if you could give those to your counsel,

12 please.

13 A      Yeah, they're close to about $9 million.

14 Q      Okay, thank you.  So pre-petition what bank

15 accounts did the Debtor have in its name?

16 A      Zero.  We had accounts that we had at Farmers

17 National Bank for a couple years that we were using.

18 Those ones were actually closed, once the seizure

19 occurred.

20 Q      Okay.  So no other bank accounts except for the

21 two at Farmers Bank?

22 A      Yeah.  I think it was three actually we had

23 there.

24 Q      I'm sorry, three.  Who had signatory authority

25 to the Debtor's bank accounts, when they were open?

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 47 of 91

1  A      I did and then my sister did, but she hasn't
2  been with us for a long time.
3  Q      Did the Debtor use any other bank accounts pre-
4  petition?
5  A      No.  No, I mean, obviously the only other one is
6  this one at Peoples Bank that I told you about before.
7  Q      So what name is on that account at Peoples Bank,
8  what entity's name?
9  A      It's not the Inc., because -- so real quickly,
10 and I apologize because I do want to tell you this.
11 Right after the seizure occurred I went to numerous
12 banks to open up accounts, and nobody would do this.  I
13 don't know if they would run the articles and maybe for
14 whatever reason, so I was unable to open up an account
15 in the corporate name.  I tried quite a bit, for about
16 five, six weeks unsuccessfully.  So the other account
17 is opened up in California Palms Addiction Recovery
18 Campus, LLC.
19 Q      California Palms Addiction Recovery Campus, LLC,
20 so that is your other entity?
21 A      No, it's not my entity.  I needed to keep my
22 name off of it, because I had the government wrongfully
23 seize my stuff, including my accounts that they closed.
24 Q      So who is the owner of that entity?
25 A      Dean Albenze, so he's actually one of the former

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 48 of 91

1   patients here, who then was running Summerfield.  He's

2   also related to the attorney who's been helping me in

3   the other case.  He's his nephew, I believe.  And he

4   opened it up.

5   Q    Does California Palms Addiction Recovery, LLC

6   have any relationship to the Debtor?

7   A    No, just this handshake relationship.

8   BY MS. BRADLEY:

9   Q    Was that entity created solely for the purposes

10   of opening this bank account?

11   A    Yes.  We needed some method and, yes, it was

12   done with that in mind.  We needed, obviously, to not

13   allow what occurred to continue, so that we could have

14   some opportunity to oppose it and get to court.

15   BY MS. SCHOENEWALD:

16   Q    Who has signatory authority on that account?

17   A    Dean Albenze.

18   Q    Only Dean Albenze?

19   A    Correct.

20   Q    And how much of the Debtor's funds --

21   A    I apologize.

22   Q    Go ahead.

23   A    If I needed to sign on there, I mean, I could go

24   down there, if that was a requirement.  What I'm trying

25   to do, and I have been trying to do for some time, is

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 49 of 91

1    open up this DIP account, and I'm having not a lot of

2    success.  I did get a new list a couple days ago, and I

3    do have an appointment at one o'clock on Friday, with

4    KeyBank, and they seem to be receptive on the phone.

5    I'm hoping that one will go good so I can open that up

6    and then move it over.

7    Q    How much of the Debtor's funds are currently in

8    that account?

9    A    I'd say roughly it's about $100,000, but I don't

10   know the exact number.

11   BY MS. BRADLEY:

12   Q    And that constitutes all of the Debtor's cash,

13   whatever is in that account?

14   A    No, because he may have his own, but whatever

15   portion of ours is a little over a hundred thousand, I

16   believe.

17   Q    Are you saying that there may be funds that

18   belong to an entity other than the Debtor that sit in

19   that account?

20   A    I don't know what Dean may have done, if he had

21   any of his own funds in there.  So I don't know that.

22   BY MS. SCHOENEWALD:

23   Q    So when funds are used of the Debtor from that

24   account, how does the Debtor get those funds to use?

25   Does Mr. Albenze write a check?  How does that work?

1    A     Yes.  He has a check that he left me a bunch

2    that are pre-signed, I can use, and then he has a

3    charge card that we can use.

4    BY MS. BRADLEY:

5    Q     How do funds get deposited into that account?

6    So, for instance, if money comes in that is owed to the

7    Debtor, but is now going to this other account, were

8    the parties -- whoever is making the payment, were they

9    notified to direct payment to this account, or -- I

10   guess that's my first question.

11   A     Yeah, so generally to answer that, if I may,

12   generally the way it was working prior to it was all of

13   it was electronic, generally all of it.  Sometimes

14   you'll get paper checks.  Once everything got held up,

15   obviously because the accounts were closed and frozen,

16   we did get some checks that came in, so those were

17   paper checks that we deposited in there.

18   Q     Okay, but have there been any electronic

19   deposits that have gone into this new --

20   A     No.  No, we didn't do any of that.  We didn't

21   re-route it or any of that.

22   Q     And if the checks were made out in the Debtor's

23   name, how were they then deposited into the account of

24   this other entity?

25   A     They were signed and they took it.  You know, at

1   least from my end, where I was at, I couldn't open up

2   an account.  Nobody would open it.

3   Q    I understand that.

4   A    This money that this company had earned --

5   Q    I understand, but if checks were made out to the

6   Debtor, and a bank account is opened in the name of a

7   non-Debtor, how were those checks then deposited into

8   that account?

9   A    I mean, they were deposited.  They were signed

10   and they deposited it.

11   Q    Did parties who wrote checks to the Debtor know

12   that their checks were being deposited into an account

13   that was not owned by the Debtor?

14   A    I don't know.  I mean, I would think not, but

15   the Debtor is using that money.  It's going to the

16   Debtor.  It's ours.

17   BY MS. SCHOENEWALD:

18   Q    Okay.  Okay.  How much cash did the Debtor have

19   on hand as of the petition date?

20   A    It was very low, maybe like under a thousand

21   dollars, I believe.

22   Q    Okay.

23   A    I'm sorry, by cash you mean like -- like hard

24   money, not -- right?

25   Q    Yes.

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 52 of 91

1  A      Yeah.  Maybe like a thousand dollars in a safe.

2  Q      Okay.  And then 90 days pre-petition, how much

3  did the Debtor collect in funds that were from accounts

4  receivables?

5  A      I'm sorry, I don't know the exact number.  I

6  would say a little over 100,000.

7  Q      Okay.  And other than that check we discussed,

8  any other funds that the Debtor has collected post-

9  petition?

10  A      No, but it will -- it will have more coming in,

11  you know, from these other entities, but no, that's the

12  only one that I have right now.

13  BY MS. BRADLEY:

14  Q      And where will that money go if you don't have

15  it -- if you're unable to open a DIP account?

16  A      Well, I'm hoping that eventually I can get back

17  to opening an account, and that I haven't done anything

18  wrong, but the alternative is to file something with

19  the Court and then get some relief on that, which is

20  the next step.  But I'm hoping that this next one works

21  in KeyBank.  So I don't have an answer.  Our next step

22  would be to inform the Court and get some guidance

23  there perhaps.

24  Q      How many banks have you attempted -- how many

25  banks have you contacted in an attempt to open a DIP

1  account?

2  A      Pre-petition or post?  The DIP?

3  Q      Well, first pre-petition, before you filed.  No,

4  I'm sorry.  I'm sorry.  After you filed bankruptcy,

5  post-petition, how many banks did you meet with or

6  call?

7  A      Besides me there was also one of my assistants

8  that I had do quite a few.  I'd say at least about a

9  dozen, and we -- like every time somebody would look up

10 the name and look at some articles, it would be a no.

11 Q      So you're saying a dozen banks were contacted,

12 either by you or your assistant.  Which banks were

13 those?

14 A      Yeah, at least that.

15 Q      Which banks were those?

16 A      So yeah, so off the top of my head, it would be

17 PNC, Chase Bank, I think Wells Fargo, and I don't

18 remember a lot of the others.  I mean, some of which I

19 even had the emails saying no.

20 Q      Yeah, so do you have a record of when you

21 contacted those banks?

22 A      Yes.  I mean, I don't know if it's a record, but

23 yeah.  Some of them I even have the emails and all that

24 stuff too.

25 Q      Can you provide the emails to your counsel?

1  A      Sure.  Sure.  Sure.  I'd be happy to.

2  Q      And when did you first reach out to a bank with

3  respect to the prospect of opening a DIP account?

4  A      I already had -- and I'm sorry for relating

5  this.  I already had the history, I knew what the

6  difficulty I had before.  I think it was probably about

7  the second or third week that I started making some

8  calls.

9  Q      The second or third week after the case was

10 filed?

11 A      Yes, ma'am.

12 Q      And you were told no by each of these financial

13 institutions, by each of these banks, you were told no?

14 A      Yeah.  What happened is, and I don't know why,

15 but when you start getting into the DIP account, it

16 seems like a lot of them don't really want to go there,

17 or they don't know what to do, and so I always ask for

18 the commercial person, go for them, and then I get the

19 second layer, which is, oh, wait a minute, we see these

20 news stories, I'm sorry, we can't do business with you.

21 Q      Okay.

22 BY MS. SCHOENEWALD:

23 Q      What expenses does the Debtor currently have?

24 A      Some of the utilities will be coming up.  It

25 actually obviously continues to pay for BestNotes,

1  those other things, so continue to have access to all

2  that stuff.  Utilities, those things.  Pretty much,

3  that's about it.

4  Q    And those are paid by those checks or the charge

5  card that you referenced earlier?

6  A    Yes, ma'am.

7  Q    As of the petition date, did the Debtor own any

8  vehicles?

9  A    No.  It has access to two of the vehicles on the

10  leases.  I don't believe it's in the Debtor's name, but

11  it has access to two of them.

12  Q    Are those the 2020 Chevy Equinox and 2019 Chevy

13  Equinox?

14  A    Yes, ma'am.

15  Q    And you said they're not in the Debtor's name.

16  What name is that lease in?

17  A    I don't know.  I'm not a hundred percent

18  positive on what that is.  I can get it to Jim, and he

19  can get it to you, but I don't believe they're in the

20  Debtor's name.

21  Q    Yes.  If you could get me a copy of those

22  leases, I would appreciate it.

23  A    What they are, if I may, is they're like three-

24  year prepaid leases, or something like that.  So

25  there's like no payment due, but --

1   Q     Has the Debtor used them post-petition?

2   A     Yes.  Just the same as before.

3   Q     So for what purpose have they been used?

4   A     Well, for example, if somebody would need to be

5   dropped off at On Demand, or somebody needs to go work

6   at Cracker Barrel, one of the guys would take him

7   there, things like that, of that nature.

8   Q     One of the guys, meaning who?

9   A     Meaning one of the volunteers there.

10  Q     So the volunteers have access to these vehicles?

11  A     Only two of them do.  Only two of the main guys

12  do.

13  BY MS. BRADLEY:

14  Q     Are the vehicles insured?

15  A     They are, yes.

16  BY MS. SCHOENEWALD:

17  Q     And are they both located at the Austintown

18  property?

19  A     They are, yes.

20  Q     Do you know when that lease expires, when that

21  three-year period is up?

22  A     I'm sorry, I don't.  I think it's a ways out,

23  like another year or two, but I don't know the exact

24  date.  I think it's definitely got some time to go.

25  Q     Other than what we've discussed regarding

1  Pender, does the Debtor own any other real estate?

2  A    It does not.

3  Q    Is the Debtor leasing any real estate?

4  A    Yeah, I was about to say, the Summerfield

5  property.

6  Q    Okay.  And what are the lease terms for that

7  Summerfield property?

8  A    It was a lease purchase.  Off the top of my

9  head, I'm sorry, I don't recall the exact price.  I

10 thought we had given a copy of that.  I think it was

11 300,000 or something like that, but it gets credit for

12 its monthly payments, which were 5,000, so I don't know

13 what's left that's due.  But it's somewhere close to

14 300,000, give or take.

15 Q    So correct me if I'm wrong.  The 300,000 is the

16 amount of the total purchase price for this property?

17 A    Yes, ma'am.

18 Q    And how much has been paid towards that at this

19 point?

20 A    It would be credit towards its rent.  I'm

21 thinking probably about let's see -- probably about 40,

22 50,000.

23 Q    How much is paid per month on this lease?

24 A    None right now.

25 Q    What are the terms of the lease required to be

1  paid per month?

2  A    Five thousand a month.

3  Q    And who is the owner of that property currently?

4  A    Let me get you the name.  It's the same as the

5  address, so give me one second.  The lease -- I'm

6  sorry, I'm opening it up.  I'm sorry.  All right.  So

7  the lease was on October 30th of -- well, that's

8  actually an incorrect date.  It was 5/14 of 2021, the

9  purchase -- the entity is 49862 Batesville Road, LLC,

10 an Arizona Company, Arizona LLC.

11 Q    Okay.  And is there a sole member of that LLC?

12 Who's responsible for that LLC?

13 A    I don't know if she's a sole member.  Her name

14 is Parisha Taylor, and I've been speaking with her and

15 her attorney too, and giving them updates.

16 Q    Does she have any relationship to you or the

17 Debtor?

18 A    No, ma'am.

19 Q    And you said the Debtor entered into that

20 agreement in March -- or I'm sorry, May of 2021?

21 A    Yeah.  That's the date that I have on there that

22 we signed it.

23 Q    And how much does the Debtor -- I'm sorry, go

24 ahead.

25 A    If I could clarify, the purchase price is

1  400,000.  We get credit at 5,000 a month.  I would

2  believe what's left due is somewhere around 360,000 to

3  purchase the property.

4  Q    Okay.  Is the Debtor current on these payments?

5  A    No, not -- we were current up to October,

6  obviously, till our accounts were closed, but not

7  since.

8  BY MS. BRADLEY:

9  Q    And is this a straight lease to own, or is this

10  a lease with an option to purchase?

11  A    Actually the tile of it is Lease With an Option

12  to Purchase, but we were -- obviously our intention was

13  to purchase it and still is.

14  BY MS. SCHOENEWALD:

15  Q    What was the intention with this property,

16  meaning does the Debtor intend to offer the same

17  services as what was previously being offered at the

18  Austintown location?

19  A    Yes.  It's a little bit different.  This is a

20  very recreational place.  It's on 80 acres.  It has

21  multiple buildings, and the intent was it could go up

22  to about 60 people in these cabins.  So it was a place

23  to get them away from the more inner-city, out into the

24  woods, into the cabins.  And so the intent was, was to

25  create a facility out there like that.  We did do some

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 60 of 91

1  telehealth through there, through here, and during the

2  process, and we at one part I think at maximum had

3  about a dozen clients out there, and our plan was to

4  just grow it, and license it perhaps separately, as a

5  subpart of this one.  That was the plan.

6  Q     So there have been operations at this property,

7  meaning there have been services provided to patients

8  at this property?

9  A     Oh, yes.  It was done through telehealth through

10 here, yes.

11 Q     So those 12 patients were not actually on that

12 property, or they were on that property?

13 A     So the 12 patients were on that property and the

14 telehealth was done from here.

15 Q     Okay.  When did the services provided those 12

16 patients stop?

17 A     At the same time as here, October 28th.

18 Q     Okay.  And how many people are currently at that

19 property?

20 A     Right now I think I have three people there that

21 are basically just keeping it secure.

22 Q     Are they making any money from the Debtor?

23 A     No.

24 Q     I'm sorry, you said no?

25 A     No.  I said no.

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 61 of 91

1  Q     Were any of the individuals living there

2  currently former tenants at the Austintown location?

3  A     Yes, all three.

4  Q     Are they paying the Debtor any sort of rent or

5  utilities?

6  A     No.

7  Q     Are they paying any rent to the individual -- or

8  the LLC that owns the property?

9  A     No, they are not.

10 Q     And the Debtor is not paying them?

11 A     Correct.

12 Q     Is the owner of that property, the LLC, the

13 Batesville LLC, are they aware of the bankruptcy?

14 A     Yes.

15 Q     And are there any costs the Debtor is incurring

16 related to this property?

17 A     I apologize, can you repeat that?  I didn't

18 quite catch it.

19 Q     Other than the lease or the payments that are

20 required to be made, are there any other costs or debt

21 that the Debtor is incurring at this point related to

22 this property?

23 A     Just the utilities, you know, keeping the

24 utilities up, the electric, water and a few minor

25 items.

1   Q     On Schedule A/B, Question 77, the Debtor lists a

2  $500,000 investment in the Summerfield property.  What

3  were those funds used for, briefly?

4  A     The improvements, getting control of the

5  property, a lot of the things that we did since we had

6  taken possession.

7  Q     Do you have a breakdown of the Debtor's funds,

8  how those funds were spent?

9  A     No, but I could probably put something together,

10  if you'd like one.

11  Q     If you could, that would be helpful.  Thank you.

12  A     Yes.

13  Q     Is there any other real estate leased or owned

14  by the Debtor that we've not discussed yet?

15  A     No, ma'am.

16  Q     Did the Debtor receive a PPP loan?

17  A     It did.  Two of them actually.

18  Q     Do you have documentation for those loans?

19  A     I do.  And both have been forgiven and we did

20  expand when we got both.  And, yes, I do have

21  documentation.

22  Q     Okay.  Is the Debtor current on all tax

23  liabilities?

24  A     To my knowledge, yes.

25  Q     Is the Debtor current on all post-petition

1  obligations?

2  A     To the best of my knowledge, yes.

3  Q     What types of insurance does the Debtor have in

4  place?

5  A     The building is presently insured for general

6  liability and then we have one in Summerfield also.

7  Q     So just general for both?

8  A     Yes, ma'am.

9  Q     No workers' comp or casualty insurance?

10  A     I apologize.  Say again.

11  Q     No workers' comp or casualty insurance or

12  anything like that?

13  A     No, not at this time.  We had it all -- all of

14  that obviously prior to October.

15  Q     Does the Debtor have any pension plans, 401(k)s

16  or the like?

17  A     No.

18  Q     Does the Debtor have any policy regarding the

19  sale of personally identifiable information that we

20  previously discussed?

21  A     Yeah.  I'm sure in our policies and procedures

22  there's a provision on there.  I'm sorry.  Sale?  No.

23  That's not something we're authorized to do, and

24  there's no plan for that.

25  BY MS. BRADLEY:

1  Q     Can you please have your counsel provide us with

2  a copy of the privacy policy?

3  A     I apologize.  On the one word, which policy,

4  ma'am?

5  Q     Your privacy policy.

6  A     Privacy?  Privacy, sure.  Sorry.  Yes.

7  BY MS. SCHOENEWALD:

8  Q     Does the Debtor have any self-funding healthcare

9  plan, or did it?

10  A     Healthcare plan?  We had -- we had health

11  insurance but nothing self-funding.

12  Q     Okay.  What is the Debtor's intention regarding

13  reorganization, just briefly, a short summary?

14  A     Sure.  The only one thing that we haven't

15  touched on is we do have the potential, obviously --

16  and they actually contacted me yesterday -- with

17  Fountainhead Capital for a loan that's been approved,

18  and it's on hold, once we get the license back.

19  They're still on hold.  That's available till summer.

20       The intention of this Debtor is to put forward

21  this information about, like I said earlier, without

22  repeating it, about what has occurred that this

23  forfeiture and seizure is all bogus, and get the Court

24  to unwind that.  And unwinding that, us going against

25  OhioMHAS to undo what they did, and finally to reopen,

22-40065-jpg    Doc 69-1    FILED 03/14/22    ENTERED 03/14/22 16:35:04    Page 65 of 91

1  to get our licenses back.  That's the intention.

2  BY MS. BRADLEY:

3  Q      And if the Bankruptcy Court were to enter an

4  order granting Pender's motion for relief from stay, so

5  meaning that the Debtor would have to vacate the

6  Austintown property, how would that impact the Debtor's

7  ability to reorganize?

8  A      Respectfully, I don't think that whatever --

9  even if that happens that Pender's thing is going to

10  happen quite as quick.  There's issues that have to be

11  addressed here in the state court over the contract and

12  those other things.  And I think that we can do all

13  that within the 60 days, no matter which way it goes.

14  That's just my opinion.  But I believe that Pender has

15  to wrap up the contract part with the eviction, because

16  that's an issue that was not decided by the state

17  court.

18  Q      If the Debtor did ultimately have to vacate that

19  property, would the Debtor still be able to reorganize?

20  A      Yes.  It would.  It would probably then proceed

21  to Summerfield, potentially what it could do there.

22  And then it also has, you know, if these other things

23  don't go correctly, and if they stall, we always have

24  the damages that are available, and I believe that's

25  part of the reorganization that would be available, so

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 66 of 91

1  I believe so, yes.

2       I believe it's a two-step process.  A, can you

3  get it done quickly, okay, take your shot.  And if you

4  can't, then you move on to Plan B, which is different.

5  And obviously, eventually, we would vacate in a

6  peaceful fashion and, you know, hand over the keys to

7  Pender, once that comes, if it comes.  We would rather

8  get them paid through the Fountainhead loan, if we can

9  get it done quickly.  I don't think it's a big if, but

10  it's certainly not a zero.

11  BY MS. SCHOENEWALD:

12  Q    Okay.  Does the Debtor have any plans to sell

13  any of its assets?

14  A    No, not right now.  I mean, it's obviously

15  wanting to move forward, as discussed.

16  Q    Okay.  Is the Debtor facing any environmental

17  problems?

18  A    No, ma'am.  We actually have an environmental

19  study, by the way, if you'd like that one also, that

20  was done for the loan.  Would you like that?

21  Q    No, that's okay.  Thank you.

22  A    It's kind of lengthy anyways.

23  BY MS. BRADLEY:

24  Q    I'm sorry, I have one question with respect to

25  the mechanism for reorganization.  How does the Debtor

1  anticipate paying for the litigation in that 60-day

2  period, or however long it takes?  So, you're going to

3  have counsel.  You're -- I think you previously

4  testified that you intend to file an application to

5  retain special counsel.  How are you going to pay them?

6  Are you going to pay them during that period of time?

7  A    I don't know if anybody is demanding funds right

8  now.  What you have to understand is that the majority

9  of this work gets done by me anyways, because I'm doing

10 it for me, which I do it for the others.  So I'm doing

11 the one that's producing a lot of it.  So, it's not

12 like the other guys have to do a lot.  But to me,

13 there's no -- nobody is asking for any funds right now.

14 They seem to be happy and they're like everybody else,

15 they're wanting to see this company get back on its

16 feet.

17 Q    But you would acknowledge that to the extent --

18 I mean, that there would be professional fees that are

19 accruing, or are you saying that these attorneys are

20 effectively not doing any work, because you're doing it

21 all?

22 A    Well, I didn't say they weren't doing any work.

23 I mean, they're obviously reviewing things and giving

24 an okay, once they agree with what I'm writing, and so

25 they're doing some of that, and -- but the real -- the

1  real point is that they believe, like I do, we will get

2  our 600,000 back, and we can do these other things, so

3  there's some hope in that belief.  But if this gets

4  extended, I would completely agree with you.  It

5  obviously changes things, if it gets extended.

6          MS. BRADLEY:  Okay, thank you.

7  BY MS. SCHOENEWALD:

8  Q    Has the Debtor made any pre-petition transfers

9  of property in the past 12 months?

10 A    No, ma'am.

11 Q    Other than the salary that you're no longer

12 receiving, have there been any transfers to you in the

13 past 12 months?

14 A    Boy, I wouldn't know that in 12 months over what

15 happens here, but no, not anything specific.

16 Q    Any payments to creditors within the 90 days

17 prior to the bankruptcy filing, outside of the ordinary

18 course of business?

19 A    No.

20 Q    Has the Debtor sold or transferred any assets

21 post-petition?

22 A    No, ma'am.

23 Q    Has the Debtor made any payment on pre-petition

24 debt post-petition?

25 A    No, ma'am.

1  Q      Other than the lawsuits we've already discussed,

2  and we don't need to revisit those, are there any other

3  pending lawsuits that the Debtor is currently involved

4  in?

5  A      No.  Just MHAS, Pender and the government.

6  Q      And is there any other counsel except for Mr.

7  Vitullo and Mr. Albenze for any of those actions?

8  A      No, ma'am, just those two.

9  Q      Are the Debtor's books maintained on a cash or

10  an accrual basis?

11  A      Boy, I'm not the best at that.  I think it's a

12  cash basis.  And I apologize, I'm not sure I know

13  exactly which.

14  Q      And who maintains the books?

15  A      Aaron Johnson from California.

16  Q      You said Aaron Johnson?

17  A      Yes, ma'am.

18  Q      A-A-R-O-N?

19  A      Yes.  He may have a company name.  It's listed

20  in our stuff.

21  Q      Would that be Johnson Accounting, Inc.?

22  A      Yes, ma'am.

23  Q      Have they provided any services since this

24  bankruptcy was filed?

25  A      No, I have not asked him to do anything.

1    Q    Did he just maintain the books or does he also

2    do the Debtor's taxes?

3    A    I think it's probably more the second.  I

4    apologize for that, but, yeah, he mainly does the

5    taxes.

6    Q    Do you intend to hire him and his firm as a

7    professional in this case?

8    A    If it extends, yes, depending on what happens in

9    these next 60 days.

10   Q    Does Johnson Accounting still have possession of

11   the Debtor's books and records?

12   A    He would and then I would, yes.

13   Q    Is the Debtor current on all federal and state

14   tax returns?

15   A    I believe so, yes.

16   Q    Has the Debtor filed its 2021 tax return yet?

17   A    No, I don't think we did the 2021s yet.

18   BY MS. BRADLEY:

19   Q    Who is going to prepare those?

20   A    It will be Aaron Johnson.

21   BY MS. SCHOENEWALD:

22   Q    So you do intend to use their services post-

23   petition?

24   A    Well, I said that earlier, yes, depending on

25   what happens in the next 60 days, yes, of course.

1  Q     Isn't the tax return due before the next 60

2  days?

3  A     I don't know the date.  I could check in on

4  that.  I'm sorry, I don't know that stuff that well.

5  BY MS. BRADLEY:

6  Q     And who would be the person that would provide

7  our office with the requested profit and loss

8  statements?

9  A     It would probably be me, and then I would send

10  them to Aaron.  We would -- he would look at it, and

11  then I would send them to you probably.

12  BY MS. SCHOENEWALD:

13  Q     Has that happened since this petition has been

14  filed?

15  A     No, ma'am.

16  BY MS. BRADLEY:

17  Q     Did you send profit and loss statements to our -

18  - have you sent any profit and loss statements to our

19  office, to perhaps Mr. John Weaver?

20  A     You know, I think the only thing is what we

21  filed with the bankruptcy.

22  Q     Okay.

23  A     I think we had something there.  I think there

24  was one that was attached, I believe.

25  Q     Okay.

1  A     But if you need something more, I can do that.

2  BY MS. SCHOENEWALD:

3  Q     So I think one of the things we did ask for is a

4  profit and loss statement for August 2021, through the

5  filing date.

6  A     Okay.

7  Q     So in providing us with that, you would use Mr.

8  Johnson's firm?

9  A     Yeah.  So I guess we would have to make a

10 request to retain him also then.

11 BY MS. BRADLEY:

12 Q     And how would he be paid?

13 A     The funds that we have.

14 Q     The funds that are in the -- the funds sitting

15 in the bank, okay.

16 A     He's not expensive.  He bills me like once a

17 year.

18 Q     Well, he would -- we could talk about it if he

19 was retained.  He would have to bill more frequently if

20 he was retained in this case.

21 A     Okay.

22 BY MS. SCHOENEWALD:

23 Q     Has the Debtor had any independent auditors

24 ever?

25 A     No, I don't believe so.

1    Q      How much was Mr. Vitullo paid for retention in

2    this matter?

3    A      Ten thousand.

4    Q      And what was the source of that retainer,

5    meaning who paid it?

6    A      It was a check that I gave him.  It was from the

7    -- the account, the LLC account.

8    Q      From California Palms Recovery Services, LLC,

9    the non-Debtor entity's account?

10   A      Right.

11   Q      Will you be reviewing invoices for legal fees

12   submitted in this case by Mr. Vitullo?

13   A      Yes.

14   Q      Will anybody else be reviewing those invoices on

15   the Debtor's behalf?

16   A      No.

17   Q      Are you willing to speak or meet with a

18   representative of the United States Trustee's Office

19   regarding fees from time to time throughout this case,

20   as necessary?

21   A      Absolutely, absolutely.

22   Q      Aside from the accountant and Mr. Albenze that

23   we've already discussed, does the Debtor have any other

24   intention of obtaining any other professionals in this

25   matter?

1   A      Not -- no, not that I foresee right now.

2   Q      Have you received the U.S. Trustee's guidelines

3   on behalf of the Debtor?

4   A      I have.  I think that's the 16 pager.  Yes,

5   ma'am, I believe I have gotten it.

6   Q      And do you understand the Debtor's obligations

7   regarding the monthly operating report?

8   A      I do.  And yes, I know we're behind.  As soon as

9   I can get this DIP account opened, we will get that in.

10  Q      So you don't intend to file the January monthly

11  operating report until you open a Debtor-in-Possession

12  account?

13  A      It's not an intention in a bad way.  It's just

14  that my focus has been on this forfeiture stuff, but

15  yes, that's something that we need to do and hopefully

16  I can put all this together soon.

17  BY MS. BRADLEY:

18  Q      And who will be preparing the monthly operating

19  report?

20  A      It would be me.

21  BY MS. SCHOENEWALD:

22  Q      If you retain the Johnson Accounting, would they

23  assist or would it still just be you?

24  A      I think they would be available if I had some

25  questions, but it probably would be me.

22-40065-jpg    Doc 69-1    FILED 03/14/22    ENTERED 03/14/22 16:35:04    Page 75 of 91

1  Q     As a reminder, when you do file that monthly

2  operating report, and this might be more for Mr.

3  Vitullo, if he's going to be filing them, but they're

4  due on the 21st of each month, and they are fillable

5  forms on our website that you will have to use.  Do you

6  understand that?

7  A     I do and I actually pulled it up, and so I think

8  I know which ones you're talking about.

9          MS. SCHOENEWALD:  Okay.  And there are a

10  number of items that we have requested and not yet

11  received, that we can go over at the end.  But at this

12  point I'm going to allow Mr. Schwieg to ask any

13  questions, if he has any.

14          MR. SCHWIEG:  Thank you.  First I have to

15  apologize.  In the middle of the call, I lost internet,

16  so I am now on the cell phone, and I may have missed

17  some of the discussion.

18  BY MR. SCHWIEG:

19  Q     So in the Summerfield property, is that being

20  operated by the Debtor or the other entity now?

21  A     No, it's still us, sir.

22  Q     I'm sorry, say that again.

23  A     No, it's still us.  It's still California Palms,

24  Inc.  There's really nothing different.  I mean, again,

25  as far as operating it, there's really not much going

22-40065-jpg   Doc 69-1   FILED 03/14/22   ENTERED 03/14/22 16:35:04   Page 76 of 91

1    on.  We're just making sure that the place doesn't get

2    vandalized.

3    Q    Okay.  So the half a million dollars that's put

4    into that property and the lease is still under the

5    control of the Debtor?

6    A    Yes, sir.

7              MR. SCHWIEG:  I have no other questions at

8    this point.

9              MS. SCHOENEWALD:  I'm sorry, Fred.  This is

10   Lauren.  Did you say you don't have any other

11   questions?  Okay.  Ms. Cady, if you have any questions,

12   you're welcome to ask them now.

13             MS. CADY:  Nothing from me.  Thank you.

14             MS. SCHOENEWALD:  Okay.  At this point, since

15   there's no other questions, we're going to leave this

16   meeting open until we receive the documents that our

17   office has requested, and have time to review those.

18   That way if we have any other questions, we can

19   reconvene this meeting and ask additional questions.

20             At this point, aside from the things we've

21   discussed today, there are some outstanding things from

22   the United States Trustee's Office, including the UST

23   Forms A through E, and the bank waiver, the profit and

24   loss statement I mentioned, copies of bank statements

25   and check registers for all of 2021 through January

1    31st of 2022, that the Debtor has used or were open and

2    now closed, any bank accounts the Debtor has used.

3           And then I think the final thing that we've

4    requested that we have not discussed today was a copy

5    of the adjudication orders from the State of Ohio.

6           THE WITNESS:  Oh, sure, we can get you that.

7           MS. SCHOENEWALD:  Okay.  And one last

8    question.  Ms. Cady, could you please give me your

9    email address, so that I can email you, as needed?  Ms.

10   Cady, if you are still there?

11          MS. CADY:  I'm sorry, what was that?

12          MS. SCHOENEWALD:  Could you please provide me

13   with your email address, just so I have it?

14          MS. CADY:  Yeah.  It's acady@beneschlaw.com.

15          MS. SCHOENEWALD:  Thank you.  Okay.  At this

16   point, unless there's anything else, we will keep this

17   meeting open but we will end for today.  Thank you,

18   everybody, for your time.  Have a good day.

19          (341 Meeting adjourned.)

20

21

22

23

24

25

State of Ohio          )

Cuyahoga County        )


CERTIFICATE


I, RICHARD GILMORE, a Notary Public, within and for the State of Ohio, do hereby certify that the above transcript is a true and accurate record of the 341 meeting held before LAUREN SCHOENEWALD, ESQ. and KATE M. BRADLEY, ESQ., REPRESENTING THE UNITED STATES TRUSTEE.  This record was prepared from an audio recording provided by the Office of the United States Trustee.

Signed this 14th day of MARCH, A.D., 2022.

*Richard Gilmore*

_____
RICHARD GILMORE
Notary Public - State of Ohio
My Commission expires 2-27-2027

**$**

**$100,000 (1)**
49:9
**$3 (1)**
44:20
**$5,314.65 (1)**
40:4
**$500,000 (1)**
62:2
**$600,000 (1)**
38:1
**$80,000 (2)**
35:15,23
**$800 (2)**
8:6,10
**$86,000 (1)**
40:19
**$9 (2)**
46:5,13

**A**

**A/B (2)**
40:16;62:1
**AA (2)**
33:16;34:3
**Aaron (4)**
69:15,16;70:20;
71:10
**A-A-R-O-N (1)**
69:18
**ability (2)**
44:4;65:7
**able (4)**
10:2;20:25;41:18;
65:19
**Absolutely (3)**
36:9;73:21,21
**abuse (2)**
27:20;36:22
**abusing (1)**
27:21
**acady@beneschlawcom (1)**
77:14
**access (12)**
30:12,21;31:1,2,4,
5;32:18,25;55:1,9,11;
56:10
**according (1)**
37:3
**account (32)**
7:12;38:3;43:24;
44:3;47:7,14,16;
48:10,16;49:1,8,13,
19,24;50:5,7,9,23;
51:2,6,8,12;52:15,17;
53:1;54:3,15;73:7,7,
9;74:9,12
**accountant (1)**
73:22
**Accounting (3)**

69:21;70:10;74:22
**accounts (16)**
40:9,19;42:17,25;
45:4;46:15,16,20,25;
47:3,12,23;50:15;
52:3;59:6;77:2
**accrual (1)**
69:10
**accruing (1)**
67:19
**accurately (1)**
7:1
**acknowledge (1)**
67:17
**acres (1)**
59:20
**across (1)**
11:15
**action (4)**
38:9,16,17,21
**actions (1)**
69:7
**activities (3)**
15:22;33:21;34:2
**actually (46)**
6:8,8;9:6;10:22,23;
11:1,6,14;13:1;14:21;
19:8,17;20:19,21;
21:21;22:8,22,23;
23:17;24:14;25:22;
28:10;29:21,22;33:7,
24;34:14;35:18;
37:14;39:12;41:9,20,
21,21;44:25;46:18,
22;47:25;54:25;58:8;
59:11;60:11;62:17;
64:16;66:18;75:7
**Adams (3)**
7:22;12:7;38:2
**Addiction (6)**
2:3;38:16;43:11;
47:17,19;48:5
**addition (1)**
35:15
**additional (2)**
21:3;76:19
**address (3)**
58:5;77:9,13
**addressed (1)**
65:11
**adjourned (1)**
77:19
**adjudication (2)**
9:22;77:5
**administration (1)**
2:21
**administrative (4)**
9:15;22:1;36:16;
38:10
**advertising (1)**
20:14
**affairs (9)**
2:20;5:17,24;6:7,

16,19;7:6;33:10;41:3
**affidavit (1)**
10:2
**affidavits (1)**
12:1
**affiliate (3)**
26:12,12,13
**affiliated (2)**
16:24;26:17
**affiliates (1)**
26:9
**affliction (1)**
27:22
**Again (8)**
9:16;20:8,9;25:10;
39:25;63:10;75:22,24
**against (6)**
10:7;14:5;18:7;
19:15;24:10;64:24
**agency (8)**
9:6,9,20,21;11:2;
21:13,24;24:19
**ago (7)**
4:17;9:10;11:18;
39:5,14;42:11;49:2
**agree (3)**
20:9;67:24;68:4
**agreed (2)**
20:18,20
**agreement (6)**
21:5;22:20;23:1;
34:21;36:4;58:20
**agreements (1)**
19:17
**ahead (5)**
22:16;41:17,25;
48:22;58:24
**Albenze (9)**
38:12,17,20;47:25;
48:17,18;49:25;69:7;
73:22
**alcohol (1)**
27:22
**alleged (1)**
19:16
**allow (5)**
3:22;9:14;38:4;
48:13;75:12
**allowed (2)**
9:18;25:6
**Allyson (1)**
3:18
**almost (3)**
12:4;13:7;21:14
**alternative (1)**
52:18
**although (1)**
38:13
**always (6)**
13:23;14:13;41:12;
43:9;54:17;65:23
**amazing (1)**
28:21

**amendment (2)**
7:6,11
**amount (1)**
57:16
**analyst (1)**
2:17
**Andrew (1)**
2:10
**answered (2)**
12:11;24:24
**Anthony (1)**
17:5
**anticipate (1)**
67:1
**anticipating (2)**
12:7,9
**Anyways (3)**
20:5;66:22;67:9
**apologies (1)**
25:12
**apologize (14)**
25:4;33:13;34:20;
42:13;44:18,25;
47:10;48:21;61:17;
63:10;64:3;69:12;
70:4;75:15
**appeal (5)**
21:17;22:1,2;36:16;
38:11
**appeals (1)**
20:10
**application (3)**
3:8;38:24;67:4
**appointment (2)**
7:14;49:3
**appraisal (1)**
46:7
**appraisals (1)**
45:23
**appraised (1)**
46:3
**appreciate (1)**
55:22
**approached (1)**
19:22
**approved (1)**
64:17
**approximately (1)**
4:17
**Arizona (2)**
58:10,10
**around (5)**
15:25;16:15;25:19;
43:10;59:2
**articles (3)**
25:24;47:13;53:10
**ASAM (1)**
27:24
**aside (5)**
43:1,16;45:4;73:22;
76:20
**Asset (1)**
3:19

**assets (10)**
7:2,9,17;44:16,20,
24;45:2,6;66:13;
68:20
**assigned (2)**
2:15,18
**assist (1)**
15:25;74:23
**assistant (1)**
53:12
**assistants (2)**
28:12;53:7
**associated (1)**
37:20
**attached (1)**
71:24
**attempt (1)**
52:25
**attempted (1)**
52:24
**attorney (4)**
2:11,14;48:2;58:15
**attorneys (2)**
21:5;67:19
**auditors (1)**
72:23
**August (5)**
19:13;20:20;22:21;
23:9;72:4
**Austintown (7)**
17:3;32:9;46:2;
56:17;59:18;61:2;
65:6
**authorities (2)**
23:4,4
**authority (2)**
46:24;48:16
**authorization (1)**
6:9
**authorized (2)**
6:5;63:23
**available (10)**
20:15;21:1;29:8,13;
30:6,9;64:19;65:24,
25;74:24
**aware (9)**
6:22;14:6,7;18:8,9;
21:12,12,15;61:13
**away (1)**
11:10;21:3;59:23

**B**

**back (15)**
5:9;11:8;23:16;
24:10;36:13;37:15;
38:1;42:21,22;44:25;
52:16;64:18;65:1;
67:15;68:2
**backward (1)**
24:8
**backwards (1)**
40:14

**bad (2)**
20:2;74:13

**bank (16)**
46:14,17,20,21,25;
47:3,6,7;48:10;51:6;
53:17;54:2;72:15;
76:23,24;77:2

**Banker (1)**
46:4

**bankruptcies (1)**
26:7

**Bankruptcy (17)**
2:4,8,17;5:23;8:17;
9:5;15:10;19:1;25:16;
26:10;37:20;53:4;
61:13;65:3;68:17;
69:24;71:21

**banks (9)**
47:12;52:24,25;
53:5,11,12,15,21;
54:13

**Barrel (1)**
56:6

**Based (6)**
3:19;10:16,21;
11:10;23:9;37:9

**basically (6)**
10:8;16:2;30:4;
31:6;33:18;60:21

**basis (1)**
11:4;69:10,12

**Batesville (2)**
58:9;61:13

**beds (3)**
41:16,20,22

**behalf (4)**
3:18;38:21;73:15;
74:3

**behind (3)**
11:2,23;74:8

**belief (3)**
25:8;37:6;68:3

**believes (1)**
37:4

**belong (1)**
49:18

**bench (1)**
19:23

**Besides (1)**
53:7

**best (6)**
6:25;24:21;30:24;
31:2;63:2;69:11

**BestNotes (2)**
30:5;54:25

**better (2)**
21:18;28:4

**big (2)**
44:8;66:9

**bill (2)**
25:6;72:19

**billed (1)**
39:19

**billing (3)**
10:17;30:7;31:19

**bills (2)**
23:17;72:16

**bit (6)**
5:9;9:8;19:9;30:4;
47:15;59:19

**bogus (3)**
23:19,20;64:23

**books (4)**
69:9,14;70:1,11

**borrower (2)**
14:23;15:2

**both (5)**
38:14;56:17;62:19,
20;63:7

**boxes (1)**
31:25

**Boy (2)**
68:14;69:11

**Bradley (24)**
2:13;16:10;31:8;
35:7;36:24;38:19;
39:15;43:19;44:14;
48:8;49:11;50:4;
52:13;56:13;59:8;
63:25;65:2;66:23;
68:6;70:18;71:5,16;
72:11;74:17

**breach (1)**
23:10

**breakdown (1)**
62:7

**briefly (4)**
33:12;44:24;62:3;
64:13

**building (5)**
13:23;16:2,3;44:8;
63:5

**buildings (1)**
59:21

**bunch (3)**
37:11;44:11;50:1

**busier (1)**
43:12

**business (8)**
21:2;26:23;27:6,17,
19;30:9;54:20;68:18

**businesses (2)**
27:1,7

**busy (3)**
43:3,8,9

**buying (1)**
33:19

**C**

**cabinet (1)**
32:12

**cabins (2)**
59:22,24

**Cady (9)**
3:18,18,23;76:11,

13;77:8,10,11,14

**California (14)**
2:3;14:22;26:15,19;
27:11;35:16,17;36:5;
47:17,19;48:5;69:15;
73:8;75:23

**call (4)**
2:16;26:11;53:6;
75:15

**called (6)**
9:14;10:8;17:12;
27:24;28:11;30:5

**calls (3)**
41:11;43:17;54:8

**came (4)**
23:24;25:24;28:15;
50:16

**Campus (3)**
2:3;47:18,19

**can (47)**
4:5;5:22;6:1,5,8;
7:15;10:9,15;11:5;
22:15;23:15;24:4,6,
11;25:5,8;27:25;
28:19;33:18;37:15;
38:4,7;40:3,24,25;
46:8,10;49:5;50:2,3;
52:16;53:25;55:18,
19;61:17;64:1;65:12;
66:2,8;68:2;72:1;
74:9,16;75:11;76:18;
77:6,9

**capacity (3)**
14:15;16:9,20

**Capital (2)**
3:19;64:17

**card (2)**
50:3;55:5

**care (9)**
10:24;17:8,11;
19:10;27:24;28:9,9,
10,21

**case (22)**
2:2,15,18,21;7:19,
22;8:1;10:16;11:4,16;
19:15,15;39:2,5;44:5,
7;48:3;54:9;70:7;
72:20;73:12,19

**cash (5)**
49:12;51:18,23;
69:9,12

**casualty (2)**
63:9,11

**catch (1)**
61:18

**cause (1)**
10:3

**CBRE (1)**
46:4

**CDCAs (1)**
28:11

**cell (1)**
75:16

**CEO (2)**
4:14;5:7

**certain (3)**
8:25;13:22,24

**certainly (4)**
38:6;42:9,15;66:10

**cetera (6)**
21:11;30:15,15,24;
32:17,24

**change (1)**
37:15

**changes (1)**
68:5

**Chapter (1)**
2:2

**charge (2)**
50:3;55:4

**charitable (1)**
15:18

**Chase (1)**
53:17

**check (10)**
39:12,21;40:1,6;
49:25;50:1;52:7;71:3;
73:6;76:25

**checks (9)**
50:14,16,17,22;
51:5,7,11,12;55:4

**Chevy (2)**
55:12,12

**civil (2)**
10:9,12

**claim (2)**
7:9,16

**claims (10)**
14:5;18:7;20:11;
40:13,15,25;42:18,23;
45:3,5

**clarify (1)**
58:25

**clean (1)**
12:10

**cleaned (1)**
13:14

**clerk (1)**
24:1

**client (1)**
3:9

**clients (6)**
12:19;15:24;16:14,
14;41:9;60:3

**clinical (6)**
10:16;17:7,10;28:9,
10;30:5

**close (4)**
12:6;45:9;46:13;
57:13

**closed (6)**
10:25;46:18;47:23;
50:15;59:6;77:2

**cloud (2)**
30:3,6

**Code (1)**

2:9

**Coldwell (1)**
46:4

**collapses (1)**
21:23

**collect (3)**
31:1,13;52:3

**collected (1)**
52:8

**coming (8)**
10:13;12:6;42:21,
22;43:22,23;52:10;
54:24

**commercial (1)**
54:18

**community (1)**
43:12

**comp (2)**
63:9,11

**companies (1)**
16:24

**company (18)**
5:5,7;10:21;11:21;
12:14;13:24;14:10,
16,18,20;15:2;19:7;
21:8;45:18;51:4;
58:10;67:15;69:19

**completely (3)**
23:18,19;68:4

**comply (1)**
23:22

**composed (1)**
28:10

**comprised (2)**
16:11;44:24

**computers (2)**
30:3,4

**concern (1)**
2:20

**concluded (1)**
2:21

**conducted (1)**
2:7

**conducting (1)**
2:25

**confirm (4)**
5:22;6:1,5;35:5

**connection (1)**
5:4

**consent (2)**
23:8,21

**consented (1)**
23:9

**constitutes (1)**
49:12

**consultants (1)**
18:16

**contacted (4)**
52:25;53:11,21;
64:16

**continue (2)**
48:13;55:1

**continued (1)**

22:12
**continues (1)**
54:25
**continuing (2)**
17:8;38:20
**contract (2)**
65:11,15
**contractors (1)**
18:16
**control (4)**
12:23;30:19;62:4;
76:5
**convince (1)**
9:13
**convinced (1)**
22:14
**coordinated (1)**
9:24
**copies (1)**
76:24
**copy (8)**
5:12,19;10:2;46:6;
55:21;57:10;64:2;
77:4
**corporate (1)**
47:15
**corporation (1)**
4:22
**corporations (1)**
27:3
**correction (4)**
9:15,17;23:21;
37:10
**corrections (1)**
9:11
**correctly (3)**
7:8;13:14;65:23
**costs (3)**
37:19;61:15,20
**counsel (16)**
3:4,8;5:12;6:5,15;
18:18;36:7;37:23;
38:9,15;46:11;53:25;
64:1;67:3,5;69:6
**counselors (1)**
33:25
**couple (5)**
28:5;30:23;46:1,17;
49:2
**course (4)**
22:17;30:9;68:18;
70:25
**Court (14)**
2:5;9:2,5;11:6;
23:1;24:6;33:19;
48:14;52:19,22;
64:23;65:3,11,17
**COVID (1)**
20:14
**COVID-19 (1)**
3:1
**Cracker (1)**
56:6

**create (1)**
59:25
**created (2)**
12:10;48:9
**credit (3)**
57:11,20;59:1
**creditor (3)**
13:9,10;45:18
**creditors (5)**
2:2,7,22;17:25;
68:16
**criminal (1)**
26:1
**cross-examinations (1)**
20:7
**cry (1)**
22:7
**current (11)**
4:25;8:4,20;17:24;
18:2,11;59:4,5;62:22,
25;70:13
**currently (12)**
15:14;17:20;18:15;
30:2,21;43:21;49:7;
54:23;58:3;60:18;
61:2;69:3
**cut (3)**
24:23;25:10;39:25

## D

**damages (2)**
42:23;65:24
**data (4)**
31:1,13,14,16
**date (11)**
25:15;36:14,19;
44:17;51:19;55:7;
56:24;58:8,21;71:3;
72:5
**Dattilio (1)**
31:4
**day (11)**
4:21;12:5;19:23;
21:2;23:2;33:4,7;
37:21;41:11;43:17;
77:18
**days (13)**
9:24;21:25;29:3;
37:7,17;38:6;49:2;
52:2;65:13;68:16;
70:9,25;71:2
**deadline (1)**
7:19
**dealing (1)**
13:5
**Dean (4)**
47:25;48:17,18;
49:20
**debt (5)**
19:17;23:16;45:22;
61:20;68:24
**Debtor (124)**

2:19;3:8;4:13;5:3;
8:4,20;13:9,16,18,19,
21;14:2,5,9;15:15;
16:12,23;17:14,25;
18:3,5,7,13,15,19,20,
22;19:1;25:14;26:7,9;
27:13;29:15;31:10,
23;33:5,11;34:23;
35:1;36:5,14,20;37:1,
4,19;38:9,12,13,15,
21;39:10;40:6,11,21;
41:18;42:7,16;43:1,4,
20,21;44:1;45:14,17;
46:6,15;47:3;48:6;
49:18,23,24;50:7;
51:6,11,13,15,16,18;
52:3,8;54:23;55:7;
56:1;57:1,3;58:17,19,
23;59:4,16;60:22;
61:4,10,15,21;62:1,
14,16,22,25;63:3,15,
18;64:8,20;65:5,18,
19;66:12,16,25;68:8,
20,23;69:3;70:13,16;
72:23;73:23;74:3;
75:20;76:5;77:1,2
**Debtor-in-Possession (1)**
74:11
**Debtor's (26)**
3:4;5:4;7:1;27:17,
19;30:1;41:5;42:3;
44:16;45:24;46:25;
48:20;49:7,12;50:22;
55:10,15,20;62:7;
64:12;65:6;69:9;70:2,
11;73:15;74:6
**debts (2)**
14:8;18:12
**decide (1)**
25:14
**decided (2)**
9:10;65:16
**decision (1)**
26:4
**Declaration (3)**
5:20;6:2,11
**deed (1)**
36:2
**defective (2)**
22:5;23:25
**deficiencies (2)**
10:14;11:3
**definitely (1)**
56:24
**degrees (2)**
12:18;28:13
**Demand (1)**
56:5
**demanding (1)**
67:7
**depending (3)**
15:9;70:8,24
**deposited (7)**

50:5,17,23;51:7,9,
10,12
**deposits (1)**
50:19
**describe (1)**
8:19
**desk (1)**
32:16
**desks (1)**
32:7
**destructive (1)**
21:20
**detox (1)**
28:25
**detoxed (1)**
28:2
**Development (1)**
27:4
**different (12)**
12:18;16:1;19:10;
30:17,25;32:7;36:13;
40:23;42:24;59:19;
66:4;75:24
**difficult (5)**
11:23;20:2;22:13;
25:25;28:18
**difficulty (1)**
54:6
**DIP (11)**
7:11;38:3;39:13;
43:24;49:1;52:15,25;
53:2;54:3,15;74:9
**direct (1)**
50:9
**directly (1)**
43:23
**director (1)**
17:20
**directors (2)**
17:22;21:10
**disclosed (2)**
37:8,17
**discovered (1)**
7:4
**discussed (10)**
18:17;52:7;56:25;
62:14;63:20;66:15;
69:1;73:23;76:21;
77:4
**discussion (1)**
75:17
**dismissed (1)**
20:19
**dispute (1)**
19:14
**disrupting (1)**
41:13
**District (2)**
2:5;7:21
**divorced (1)**
26:24
**Docket (1)**
7:19

**doctor (3)**
29:9,10,11
**document (3)**
10:3,4;11:15
**documentation (3)**
22:21;62:18,21
**documents (7)**
6:14,22;7:1;10:13,
20;11:14;76:16
**dog (1)**
21:9
**dollars (4)**
45:10;51:21;52:1;
76:3
**done (18)**
4:2;19:18;20:1;
21:4,4;22:22;25:8;
45:23,25;48:12;
49:20;52:17;60:9,14;
66:3,9,20;67:9
**door (2)**
16:18;19:4
**dormant (1)**
27:5
**down (8)**
4:6;12:9;28:3,19,
20;36:13;39:1;48:24
**downstairs (1)**
32:6
**dozen (3)**
53:9,11;60:3
**drastic (1)**
41:7
**drawer (2)**
32:12;39:12
**Dropbox (2)**
30:10,24
**dropped (1)**
56:5
**drug (1)**
21:9
**drugs (1)**
27:22
**due (9)**
2:25;19:17;35:17;
42:25;55:25;57:13;
59:2;71:1;75:4
**duress (1)**
19:18
**during (3)**
37:20;60:1;67:6
**duties (2)**
8:19;12:12,13,15
**duty (1)**
8:24

## E

**E/F (1)**
45:17
**earlier (5)**
10:15;19:22;55:5;
64:21;70:24

**early (1)**
27:25
**earned (1)**
51:4
**economically (1)**
19:9
**effectively (1)**
67:20
**efforts (2)**
22:11,12
**Eight (1)**
8:8
**either (5)**
4:19;27:22;34:11;
42:20;53:12
**electric (1)**
61:24
**Electronic (6)**
5:20;6:2,6,12;
50:13,18
**electronically (3)**
3:3;6:9;32:2
**else (8)**
3:6,12,20;13:13;
31:6;67:14;73:14;
77:16
**email (3)**
77:9,9,13
**emails (4)**
21:5;53:19,23,25
**emergency (1)**
19:2
**employee (1)**
31:9
**employees (8)**
12:16;15:15;16:12;
17:14,25;18:2,11,16
**encumbrances (1)**
45:15
**end (4)**
23:7;51:1;75:11;
77:17
**enough (3)**
5:10,11;38:6
**entail (1)**
12:13
**enter (2)**
20:20;65:3
**entered (3)**
34:22;39:5;58:19
**entities (1)**
52:11
**entity (9)**
23:15;47:20,21,24;
48:9;49:18;50:24;
58:9;75:20
**entity's (2)**
47:8;73:9
**environmental (2)**
66:16,18
**envision (1)**
37:23
**Equinox (2)**

55:12,13
**Equipment (3)**
45:18,19,19
**equity (2)**
13:11,12
**errors (1)**
7:4
**estate (3)**
57:1,3;62:13
**et (6)**
21:11;30:14,15,24;
32:16,23
**even (4)**
31:20;53:19,23;
65:9
**eventually (3)**
38:4;52:16;66:5
**Everybody (4)**
26:1;31:19;67:14;
77:18
**everyone (1)**
3:12
**evict (1)**
22:18
**eviction (3)**
23:7;24:13;65:15
**evidence (1)**
24:21
**exact (6)**
17:16;40:3;49:10;
52:5;56:23;57:9
**exactly (2)**
11:17;69:13
**examination (3)**
2:22;3:22;4:7
**examine (1)**
2:19
**example (10)**
11:15;15:24;16:17;
20:13;28:1;32:14,15;
33:24;41:13;56:4
**except (2)**
46:20;69:6
**exclusively (1)**
32:21
**excuse (1)**
22:20
**exist (1)**
33:2
**expand (5)**
12:25;15:16;19:12;
21:21;62:20
**expect (1)**
37:25
**expenses (1)**
54:23
**expensive (1)**
72:16
**expires (1)**
56:20
**exposed (1)**
11:21
**extended (2)**

68:4,5
**extends (1)**
70:8
**extent (3)**
16:12;37:21;67:17
**externally (1)**
34:3

**F**

**facially (1)**
23:25
**facilities (2)**
16:5;17:10
**facility (5)**
13:1;28:21;36:23;
42:2;59:25
**facing (1)**
66:16
**fact (1)**
11:21
**familiar (1)**
31:12
**far (1)**
75:25
**Fargo (1)**
53:17
**Farmers (2)**
46:16,21
**fashion (1)**
66:6
**favor (1)**
37:12
**FBI (2)**
31:24;33:5
**February (4)**
4:20,21;7:18;29:21
**federal (7)**
8:23;11:25;22:7;
23:3,18;45:2;70:13
**federally (1)**
40:24
**fees (4)**
37:24;67:18;73:11,
19
**feet (1)**
67:16
**few (7)**
12:18;17:13;25:17,
17;31:25;53:8;61:24
**fiancee (2)**
31:5,9
**file (10)**
19:1;21:25;22:2;
25:14;26:5;38:25;
52:18;67:4;74:10;
75:1
**filed (22)**
2:3;6:20,22;7:9,16,
20;9:1;10:7;24:3,13;
26:9;38:25;39:3,8;
44:5;53:3,4;54:10;
69:24;70:16;71:14,21

**files (7)**
30:1,5,7,10,12;
31:23;33:1
**Filing (13)**
5:20;6:3,12;7:4;
8:17;10:10,12;23:14;
40:24;44:17;68:17;
72:5;75:3
**filings (1)**
19:4
**fill (1)**
41:12
**fillable (1)**
75:4
**final (2)**
20:15;77:3
**finally (2)**
16:4;64:25
**financial (10)**
2:20;5:17,24;6:7,
16,19;7:6;33:10;41:2;
54:12
**financing (3)**
20:25;21:4;23:3
**findings (5)**
9:22;10:5;11:17;
20:15;37:9
**finish (2)**
25:1,3
**firm (2)**
70:6;72:8
**first (9)**
2:1;3:4;21:22;
36:12;39:9;50:10;
53:3;54:2;75:14
**five (11)**
4:17;11:13;13:25;
25:22;27:5,9;29:22;
32:7;41:22;47:16;
58:2
**fixtures (1)**
45:9
**flowing (2)**
13:6,8
**focus (3)**
27:5,10;74:14
**focusing (1)**
44:7
**followed (1)**
12:1
**following (1)**
20:21
**food (3)**
28:7;35:1,3
**force (2)**
10:6;11:6
**forced (1)**
10:10
**foreclosure (1)**
20:13
**foresee (1)**
74:1
**forever (2)**

17:23;38:5
**forfeiture (13)**
8:23;9:3,4,21;
10:10,12,18;11:16;
23:18;38:17,21;
64:23;74:14
**forget (1)**
30:7
**forgiven (1)**
62:19
**formed (1)**
18:19
**former (13)**
15:24;16:12,14,14;
18:11;26:11;33:25;
34:7,8,10,12;47:25;
61:2
**forms (3)**
30:11;75:5;76:23
**forward (5)**
21:7,20;24:10;
64:20;66:15
**found (2)**
9:25;10:15
**foundation (4)**
9:3,4;10:18;37:11
**Fountainhead (2)**
64:17;66:8
**four (1)**
41:6
**fraud (1)**
24:18
**Fred (2)**
3:14;76:9
**free (2)**
10:24;19:10
**frequently (1)**
72:19
**Friday (2)**
29:12;49:3
**front (4)**
5:14;23:25;24:5;
38:1
**frozen (1)**
50:15
**full (2)**
4:10;43:14
**fully (2)**
7:1;8:13
**functioned (1)**
33:7
**Fund (2)**
3:19;37:19
**funds (24)**
8:12;21:24;38:3,5;
39:10;43:25;45:12;
48:20;49:7,17,21,23,
24;50:5;52:3,8;62:3,
7,8;67:7,13;72:13,14,
14
**furniture (2)**
45:8,13

22-40065-jpg     Doc 69-1     FILED 03/14/22     ENTERED 03/14/22 16:35:04     Page 83 of 91

## G

**gave (2)**
20:18;73:6
**general (2)**
63:5,7
**generally (3)**
50:11,12,13
**generate (2)**
44:4,10
**generous (2)**
10:22;11:22
**gets (4)**
57:11;67:9;68:3,5
**given (2)**
22:23;57:10
**giving (2)**
58:15;67:23
**goals (1)**
12:18
**goes (1)**
65:13
**good (6)**
5:9,11;18:22;19:8;
49:5;77:18
**government (9)**
8:11;10:7,10;24:7,
17;42:23;45:2;47:22;
69:5
**government's (2)**
11:4,6
**grading (1)**
45:20
**granting (1)**
65:4
**great (1)**
5:15
**grow (2)**
12:25;60:4
**growing (1)**
12:15
**guaranteed (7)**
14:8,11,15,17,19,
20;18:12
**guarantor (2)**
14:23;15:1
**guess (3)**
17:15;50:10;72:9
**guidance (1)**
52:22
**guidelines (1)**
74:2
**Gustafson (1)**
2:6
**guy (1)**
34:5
**guys (4)**
56:6,8,11;67:12

## H

**half (3)**
20:24;21:14;76:3
**hand (6)**
4:1,6;10:6;11:6;
51:19;66:6
**handle (1)**
21:16
**handshake (1)**
48:7
**hanging (2)**
15:19;16:25
**happen (6)**
23:1,6;24:11;37:18,
22;65:10
**happened (3)**
43:25;54:14;71:13
**happens (7)**
15:10;35:11;39:22;
65:9;68:15;70:8,25
**happy (2)**
54:1;67:14
**hard (2)**
45:6;51:23
**head (4)**
42:6;45:1;53:16;
57:9
**heading (1)**
42:10
**health (3)**
27:20;38:16;64:10
**healthcare (5)**
10:5;15:17;24:18;
64:8,10
**hearing (4)**
9:16;10:25;11:2;
16:4
**hearings (2)**
12:1,8
**height (1)**
20:14
**held (5)**
4:15;5:5,6;12:2;
50:14
**helpful (1)**
62:11
**helping (3)**
16:2;30:25;48:2
**helps (2)**
31:11,12
**heroin (1)**
28:1
**hey (1)**
24:17
**hiding (1)**
24:7
**himself (1)**
3:5
**hire (1)**
70:6
**historically (1)**
27:18
**history (4)**
5:1,9;19:25;54:5
**hoist (1)**

**hold (7)**
12:8,23;15:7;40:3;
46:9;64:18,19
**holding (2)**
23:24;40:2
**home (2)**
33:11,22
**homeless (1)**
43:11
**hope (3)**
9:7;12:10;68:3
**hopefully (2)**
7:15;74:15
**hoping (3)**
49:5;52:16,20
**hotel (1)**
5:6
**hour (2)**
20:24;34:1
**hours (1)**
12:5
**housing (1)**
28:6
**hundred (5)**
8:8;41:1;42:22;
49:15;55:17

## I

**identical (1)**
10:14
**identifiable (1)**
63:19
**immediately (1)**
29:18
**impact (1)**
65:6
**imposed (1)**
3:1
**improvements (1)**
62:4
**Inc (4)**
2:3;47:9;69:21;
75:24
**inception (1)**
10:22
**include (1)**
31:16
**including (4)**
11:21;24:12;47:23;
76:22
**income (2)**
42:4;44:5
**incorporated (5)**
4:16,22;18:20;
29:15,22
**incorporation (1)**
29:19
**incorrect (1)**
58:8
**increase (1)**
41:7

19:3
**increased (1)**
19:17
**incurring (2)**
61:15,21
**indebted (2)**
13:19;18:3
**independent (2)**
18:15;72:23
**indicate (2)**
6:6;41:6
**indicated (1)**
35:4
**indicates (1)**
33:11
**individual (1)**
61:7
**individuals (4)**
13:5;34:6,16;61:1
**industry (2)**
13:4;15:17
**inform (2)**
9:2;52:22
**information (7)**
6:14;24:6;31:17,18;
37:8;63:19;64:21
**inlocks (1)**
8:24
**inner-city (1)**
59:23
**in-person (1)**
3:1
**inspections (1)**
9:17
**instance (1)**
50:6
**institutions (1)**
54:13
**insurance (5)**
37:24;63:3,9,11;
64:11
**insured (2)**
56:14;63:5
**intellectual (1)**
45:6
**intend (7)**
37:19;38:25;59:16;
67:4;70:6,22;74:10
**intent (2)**
59:21,24
**intention (7)**
59:12,15;64:12,20;
65:1;73:24;74:13
**interest (4)**
26:19,23,25;27:8
**internet (1)**
75:15
**into (14)**
8:21;34:22;38:3;
39:13;50:5,19,23;
51:7,12;54:15;58:19;
59:23,24;76:4
**introduce (2)**
3:5,17

**introduced (1)**
3:21
**inventory (1)**
45:7
**investigation (2)**
22:8;40:14
**investment (1)**
62:2
**invoices (2)**
73:11,14
**involved (3)**
9:20;22:5;69:3
**issue (2)**
19:3;24:14;65:16
**issues (10)**
9:16;10:5,14,16;
20:17;21:12;22:14;
24:2;41:14;65:10
**items (4)**
8:22;45:15;61:25;
75:10

## J

**James (1)**
38:10
**Jamie (1)**
31:4
**January (4)**
2:4;10:11;74:10;
76:25
**Jim (2)**
3:7;55:18
**jobs (1)**
17:6
**John (3)**
2:6;16;71:19
**Johnson (6)**
69:15,16,21;70:10,
20;74:22
**Johnson's (1)**
72:8
**Judge (5)**
2:6;7:22;12:7;24:1;
38:2
**judgment (1)**
19:18,20;23:8

## K

**Kate (1)**
2:13
**keep (3)**
7:10;47:21;77:16
**keeping (2)**
60:21;61:23
**keeps (1)**
33:16
**kept (2)**
24:7;28:20
**KeyBank (3)**
7:14;49:4;52:21
**keys (3)**

32:18,23;66:6
**kicking (1)**
25:19
**kind (3)**
15:23;21:23;66:22
**kinds (1)**
44:9
**knew (4)**
21:16;22:4;23:21;
54:5
**knowledge (3)**
6:25;62:24;63:2

**L**

**label (1)**
33:18
**landlord (1)**
26:12
**largest (1)**
41:21
**last (12)**
4:11;25:3;33:4,7;
34:19;38:6;40:3;41:5;
42:7,9;45:24;77:7
**late (1)**
20:20
**later (1)**
9:24
**Lauren (2)**
2:11;76:10
**law (2)**
9:12;22:10
**lawsuits (2)**
69:1,3
**layer (1)**
54:19
**lease (17)**
34:22;36:4,10,11;
55:16;56:20;57:6,8,
23,25;58:5,7;59:9,10,
11;61:19;76:4
**leased (1)**
62:13
**leases (3)**
55:10,22,24
**leasing (1)**
57:3
**least (3)**
51:1;53:8,14
**leave (1)**
76:15
**led (1)**
41:7
**left (9)**
13:13;31:24,25;
32:1,4,24;50:1;57:13;
59:2
**legal (1)**
73:11
**legitimately (1)**
11:9
**lender (1)**

46:9
**Lending (1)**
3:19
**lengthy (2)**
9:8;66:22
**lent (2)**
13:21;14:1
**letter (2)**
24:22;25:5
**level (3)**
19:15;27:25;28:11
**levels (2)**
27:24;28:4
**liabilities (2)**
7:2;62:23
**liability (1)**
63:6
**license (12)**
9:7,9;11:8;22:14;
24:10,20;36:15,21;
37:2,15;60:4;64:18
**licensed (1)**
41:20
**licenses (1)**
65:1
**license-wise (1)**
33:8
**licensing (3)**
21:13;29:25;41:14
**lien (3)**
45:18,19,22
**liens (1)**
45:15
**liked (1)**
21:18
**line (1)**
3:21
**list (2)**
40:19;49:2
**listed (5)**
27:14;35:15,23;
44:19;69:19
**lists (2)**
45:17;62:1
**litigation (1)**
67:1
**little (9)**
5:9;9:8;19:9;34:4;
44:20;46:5;49:15;
52:6;59:19
**living (1)**
33:22;34:6;61:1
**LLC (19)**
14:22;26:11,15,20;
27:11;35:16;36:5;
47:18,19;48:5;58:9,
10,11,12;61:8,12,13;
73:7,8
**loan (19)**
12:23,24;14:10,16,
17,22,25;15:4,7,11;
20:3,22;22:13,22;
23:12;62:16;64:17;

66:8,20
**loans (4)**
13:18;18:5;45:25;
62:18
**located (4)**
30:1;32:5,19;56:17
**location (4)**
17:3;32:9;59:18;
61:2
**locked (3)**
32:12,16,16
**locks (1)**
32:15
**long (8)**
4:15;11:13;19:25;
37:2,4;39:5;47:2;67:2
**longer (4)**
28:21;37:21,22;
68:11
**longstanding (1)**
19:14
**look (6)**
24:21;25:4;26:14;
53:9,10;71:10
**looked (3)**
25:16,22;26:1
**looking (7)**
12:24,25;13:1;15:4;
19:11;21:21;44:18
**looks (2)**
24:16,21
**losing (1)**
36:21
**loss (5)**
71:7,17,18;72:4;
76:24
**lost (2)**
36:15;75:15
**lot (24)**
13:3,3,5;15:18;
19:8,10;23:16;26:3;
27:4;28:9;30:10;31:7,
12;32:2;35:2;38:14;
41:15;43:10;49:1;
53:18;54:16;62:5;
67:11,12
**low (1)**
51:20
**lower (1)**
28:11
**LPNs (2)**
28:15,24
**lunch (1)**
20:8

**M**

**ma'am (33)**
4:19;5:14,18;6:4,
13;8:9,15;13:17;14:4;
15:13;16:8;17:12,19;
26:6;29:11;39:1;
54:11;55:6,14;57:17;

58:18;62:15;63:8;
64:4;66:18;68:10,22,
25;69:8,17,22;71:15;
74:5
**main (1)**
56:11
**mainly (2)**
9:9;70:4
**maintain (1)**
70:1
**maintained (1)**
69:9
**maintains (1)**
69:14
**majority (3)**
11:19;29:1;67:8
**makes (1)**
12:20
**making (5)**
16:2;50:8;54:7;
60:22;76:1
**management (1)**
13:3
**managing (2)**
5:7;12:15
**mans (1)**
16:18
**many (12)**
10:4;15:18;17:3,14,
22;29:3;41:16,18;
52:24,24;53:5;60:18
**March (3)**
2:24;4:20;58:20
**married (3)**
26:22,24,24
**master (2)**
30:19;32:23
**master's (2)**
12:17;28:13
**match (1)**
11:17
**matter (3)**
65:13;73:2,25
**matters (1)**
2:20
**maximum (1)**
60:2
**may (11)**
15:16;37:21;39:22;
49:14,17,20;50:11;
55:23;58:20;69:19;
75:16
**maybe (3)**
47:13;51:20;52:1
**MD (2)**
12:16;28:15
**MDs (1)**
28:24
**mean (25)**
15:3;16:22,23;20:1;
21:18;24:16;29:9,18;
33:12;34:13;42:12;
43:5,23;44:1;47:5;

48:23;51:9,14,23;
53:18,22;66:14;
67:18,23;75:24
**Meaning (8)**
5:1;30:12;56:8,9;
59:16;60:7;65:5;73:5
**mechanism (1)**
66:25
**Medicaid (10)**
10:23;11:22;24:22;
25:5;35:2;39:11;40:7,
10;42:16;43:1
**Medicaid's (1)**
11:9
**medical (6)**
16:6;21:11;28:23;
29:7;31:17;34:8
**meet (2)**
53:5;73:17
**meeting (8)**
2:2,7,25;3:2;76:16,
19;77:17,19
**meetings (2)**
33:16;34:3
**meets (1)**
34:1
**member (2)**
58:11,13
**members (2)**
34:9,12
**mental (2)**
27:20;38:16
**mentioned (2)**
45:5;76:24
**mess (1)**
12:10
**method (2)**
24:8;48:11
**MHAS (4)**
23:19,19;24:10;
69:5
**middle (2)**
4:12;75:15
**midst (1)**
23:13
**might (2)**
17:5;75:2
**million (7)**
41:6,7;44:21;45:10;
46:5,13;76:3
**mind (3)**
9:7;23:7;48:12
**minor (1)**
61:24
**minute (1)**
54:19
**missed (1)**
75:16
**moment (1)**
8:2
**Monday (2)**
20:21;21:2
**money (15)**

22-40065-jpg    Doc 69-1    FILED 03/14/22    ENTERED 03/14/22 16:35:04    Page 85 of 91

10:5,8;13:21;14:2;
19:11;40:7;43:22;
44:2,3;50:6;51:4,15,
24;52:14;60:22
**month (7)**
4:22;36:11;57:23;
58:1,2;59:1;75:4
**monthly (5)**
57:12;74:7,10,18;
75:1
**months (5)**
11:13;13:7;68:9,13,
14
**more (12)**
20:22;22:13;40:15,
25;41:9;42:1;52:10;
59:23;70:3;72:1,19;
75:2
**morning (1)**
20:5
**most (7)**
8:23;28:13;39:10;
46:3
**motion (2)**
10:8;65:4
**motions (1)**
10:9
**move (7)**
15:5;24:25;25:1,11;
49:6;66:4,15
**moved (1)**
20:23
**moving (2)**
21:20;22:18
**much (17)**
22:13;34:24;39:21;
40:1,9,10;43:12;
48:20;49:7;51:18;
52:2;55:2;57:18,23;
58:23;73:1;75:25
**multiple (3)**
21:10;23:15;59:21

**N**

**name (23)**
2:10;3:7;4:10,11,
12;30:7,8;38:12;
46:15;47:7,8,15,22;
50:23;51:6;53:10;
55:10,15,16,20;58:4,
13;69:19
**names (1)**
27:13
**Naples (1)**
33:25
**national (2)**
46:5,17
**nature (1)**
27:17;45:14;56:7
**near (1)**
17:13
**necessary (1)**

73:20
**need (9)**
5:15;20:3;25:11;
30:14;43:24;56:4;
69:2;72:1;74:15
**needed (11)**
20:22;21:4;24:4;
28:25;29:1;44:9;
47:21;48:11,12,23;
77:9
**needs (1)**
56:5
**nephew (1)**
48:3
**net (2)**
42:3,5
**new (4)**
12:23;44:5;49:2;
50:19
**news (1)**
54:20
**next (7)**
22:8;52:20,20,21;
70:9,25;71:1
**nobody (4)**
12:3;47:12;51:2;
67:13
**non-Debtor (2)**
51:7;73:9
**none (2)**
8:5;57:24
**normally (1)**
28:22
**Northern (2)**
2:5;7:21
**Notes (2)**
30:24;31:2
**notice (2)**
11:1,2
**notified (1)**
50:9
**November (1)**
39:9
**Number (13)**
7:19,22;8:1,25;
12:20,20;17:16;28:6;
37:25;38:2;49:10;
52:5;75:10
**numerous (3)**
9:16;15:8;47:11
**nurses (2)**
28:24;32:22
**nurse's (1)**
32:15
**nursing (3)**
28:14;29:5;32:8

**O**

**obligated (1)**
16:15
**obligations (2)**
63:1;74:6

**obtaining (1)**
73:24
**obviously (23)**
7:10;10:3;12:2,15;
19:2;22:7,14;26:17;
28:8;30:18;38:13;
47:5;48:12;50:15;
54:25;59:6,12;63:14;
64:15;66:5,14;67:23;
68:5
**occur (1)**
44:11
**occurred (15)**
9:13,16;10:1;15:6;
20:13;22:3,25;23:7,8;
33:20;36:13;46:19;
47:11;48:13;64:22
**occurs (1)**
15:20
**o'clock (1)**
49:3
**October (20)**
8:12;10:1;19:7,13;
21:22,23;22:20,24;
23:8;31:25;33:5,8;
36:15,19;37:14;
39:18;58:7;59:5;
60:17;63:14
**odd (2)**
22:9;24:16
**off (11)**
23:24;24:23;25:10;
30:19;39:25;42:6;
45:1;47:22;53:16;
56:5;57:8
**offer (1)**
59:16
**offered (1)**
59:17
**Office (13)**
2:12,13,14,17;32:6,
8,15;36:8;71:7,19;
73:18;76:17,22
**officers (1)**
15:14
**often (1)**
29:3
**Ohio (6)**
2:5;7:21;18:21,23;
38:16;77:5
**OhioMHAS (3)**
11:17;37:8;64:25
**omissions (1)**
7:5
**once (16)**
11:5,20;13:13;
20:22;24:9;25:24;
36:12;37:6,16;38:1;
46:18;50:14;64:18;
66:7;67:24;72:16
**On-Demand (1)**
17:12
**one (64)**

7:9,13,25;8:2,22,
25;11:15;12:20;13:2;
14:12,21;15:1,3,9;
17:12,13;19:2;21:2;
24:13;26:21;27:14;
28:6;29:9,9,11;30:8;
33:25;34:5;37:25;
38:2,4,11,12,25;
39:23;40:3,4;46:5,9,
10;47:5,6,25;49:3,5;
52:12,20;53:7;56:6,8,
9;58:5;60:2,5;62:10;
63:6;64:3,14;66:19,
24;67:11;71:24;72:3;
77:7
**one-day (1)**
19:23
**ones (3)**
15:8;46:18;75:8
**only (15)**
11:10;17:20,23;
21:2;28:25;29:9;
32:21,25;47:5;48:18;
52:12;56:11,11;
64:14;71:20
**onsite (2)**
28:14;34:14
**open (17)**
11:7;13:7;38:4;
43:24;46:25;47:12,
14;49:1,5;51:1,2;
52:15,25;74:11;
76:16;77:1,17
**opened (4)**
47:17;48:4;51:6;
74:9
**opening (5)**
7:11;48:10;52:17;
54:3;58:6
**operate (3)**
29:20;36:20,22
**operated (2)**
32:2;75:20
**operating (14)**
27:8,8;29:16,21;
33:5,11;41:19;43:5,7;
74:7,11,18;75:2,25
**operational (1)**
4:20
**operations (1)**
60:6
**opinion (1)**
65:14
**opportunity (3)**
2:23;19:21;48:14
**oppose (1)**
48:14
**option (2)**
59:10,11
**order (3)**
9:23;20:16;65:4
**orders (1)**
77:5

**ordinary (1)**
68:17
**others (6)**
8:24;31:7;53:18;
67:10
**ours (2)**
49:15;51:16
**out (22)**
9:11,13,25;14:21;
15:5,11;19:4;20:10;
21:3;25:25;30:23;
31:11;35:10;40:15;
42:20;50:22;51:5;
54:2;56:22;59:23,25;
60:3
**outbreak (1)**
3:2
**outright (2)**
45:14,16
**outside (3)**
5:3;44:2;68:17
**outstanding (5)**
40:11,21,21;42:17;
76:21
**over (11)**
13:25;24:17;44:20;
46:5;49:6,15;52:6;
65:11;66:6;68:14;
75:11
**oversight (1)**
12:16
**owe (2)**
13:24;14:2
**owed (2)**
45:22;50:6
**own (17)**
17:6;9:21:9;26:16,
21;32:15,16;34:2;
35:3,3;45:14,16;
49:14,21;55:7;57:1;
59:9
**owned (2)**
51:13;62:13
**owner (3)**
47:24;58:3;61:12
**owns (1)**
61:8

**P**

**Page (1)**
40:16
**pager (1)**
74:4
**paid (21)**
8:13,16;16:20,23;
19:22;23:17;24:4,12;
35:5,9;39:2,4,23;
55:4;57:18,23;58:1;
66:8;72:12;73:1,5
**Palms (3)**
2:3;14:22;26:15,20;
27:11;35:16,17;36:5;

47:17,19;48:5;73:8;
75:23
**paper (2)**
50:14,17
**Parisha (1)**
58:14
**park (1)**
28:14
**part (9)**
22:19;27:22;28:8;
34:19;39:9;40:12;
60:2;65:15,25
**particular (1)**
44:3
**particularly (1)**
43:3
**parties (3)**
3:16;50:8;51:11
**parties-in-interest (1)**
2:22
**parts (1)**
9:1
**password (2)**
30:14,16
**past (9)**
22:24;27:3,5,9;
30:17;34:8;42:4;68:9,
13
**patient (2)**
31:17,18
**patients (9)**
34:7,10,13;41:18;
48:1;60:7,11,13,16
**pay (5)**
15:5;37:23;54:25;
67:5,6
**paying (5)**
34:16;61:4,7,10;
67:1
**payment (5)**
39:16;50:8,9;55:25;
68:23
**payments (5)**
34:17;57:12;59:4;
61:19;68:16
**peaceful (1)**
66:6
**penalty (1)**
6:23
**Pender (20)**
3:18;12:24;15:5;
19:3,14,16,22;20:1,
21;22:18;24:4,12;
36:1,2;41:15;42:21;
57:1;65:14;66:7;69:5
**Pender's (6)**
14:10,16,17;36:1;
65:4,9
**pending (9)**
2:5;3:8;7:12;19:2;
20:10,17;22:2;36:17;
69:3
**pension (1)**

63:15
**people (19)**
11:23;12:9;15:18;
17:3;20:25;21:10;
28:11,18;30:17,19,22,
25;33:15,22;37:16;
43:11;59:22;60:18,20
**Peoples (2)**
47:6,7
**per (8)**
8:8,10;28:1;29:4;
36:11;43:11;57:23;
58:1
**percent (4)**
10:24;13:15;41:22;
55:17
**perhaps (4)**
8:24;52:23;60:4;
71:19
**period (11)**
4:21;22:17;28:2;
35:23,25;36:1;37:21;
39:17;56:21;67:2,6
**perjury (1)**
6:23
**person (3)**
27:21;54:18;71:6
**personal (1)**
14:15
**personally (8)**
6:18;14:8,18,20;
16:23;18:12;25:7;
63:19
**perspective (1)**
8:14
**petition (14)**
5:13,16,23;6:6,15,
18;7:5;27:14;47:4;
51:19;52:9;55:7;
70:23;71:13
**PhD (1)**
12:17
**philosophies (1)**
10:21
**phone (6)**
3:6,10,12;29:8;
49:4;75:16
**physical (1)**
31:23
**place (6)**
5:6;10:25;59:20,22;
63:4;76:1
**places (1)**
28:22
**plan (12)**
9:14,17;11:12;
23:20;24:14;37:10;
60:3,5;63:24;64:9,10;
66:4
**plans (2)**
63:15;66:12
**pleadings (1)**
19:19

**please (17)**
3:4,17,25;4:1,9;
5:22;6:1;7:24,25;
8:19;27:16;33:12;
36:7;46:12;64:1;77:8,
12
**plenty (2)**
39:24;41:12
**plus (1)**
42:22
**PNC (1)**
53:17
**point (21)**
3:24;12:7;13:6,8;
14:3;20:9;21:7,8;
22:11;23:11;25:7;
31:6;40:10;57:19;
61:21;68:1;75:12;
76:8,14,20;77:16
**policies (1)**
63:21
**policy (4)**
63:18;64:2,3,5
**portion (2)**
28:7;49:15
**position (4)**
4:15,25;8:20;22:15
**positions (1)**
4:24
**positive (1)**
55:18
**possession (2)**
62:6;70:10
**possibility (2)**
11:8;25:16
**possibly (1)**
21:21
**post (1)**
53:2
**post- (2)**
52:8;70:22
**post-petition (9)**
35:13,17;40:7,8;
53:5;56:1;62:25;
68:21,24
**potential (2)**
42:23;64:15
**potentially (3)**
25:20;32:8;65:21
**power (1)**
37:16
**PPP (1)**
62:16
**pre- (1)**
47:3
**pre-October (3)**
12:12;17:18,22
**prepaid (1)**
55:24
**prepare (3)**
6:15;38:13;70:19
**preparing (3)**
40:14,23;74:18

**pre-petition (8)**
8:13;17:15;46:14;
52:2;53:2,3;68:8,23
**present (2)**
3:12;8:24
**presented (3)**
19:5;23:2;26:3
**presently (1)**
63:5
**President (2)**
4:14;5:7
**pre-signed (1)**
50:2
**pressed (1)**
20:8
**pretty (6)**
13:6,8;21:9;23:17;
34:24;55:2
**prevailed (2)**
19:18,19
**prevent (1)**
24:13
**previously (5)**
35:4;36:25;59:17;
63:20;67:3
**price (3)**
57:9,16;58:25
**principal (1)**
28:5
**principally (2)**
32:1,2
**prior (12)**
4:24;5:8;17:24;
19:7;26:7;34:11;36:1,
2;39:18;50:12;63:14;
68:17
**privacy (4)**
64:2,5,6,6
**probable (1)**
10:3
**probably (16)**
7:7;9:1;16:13,13;
19:4;35:25;39:9;54:6;
57:21,21;62:9;65:20;
70:3;71:9,11;74:25
**problem (2)**
22:18;25:23
**problems (3)**
23:2;26:3;66:17
**procedures (2)**
11:25;63:21
**proceed (1)**
65:20
**proceeded (3)**
9:15;21:7,17
**proceeding (2)**
14:13,25
**process (4)**
11:1;37:5;60:2;
66:2
**producing (1)**
67:11
**product (1)**

9:23
**professional (2)**
67:18;70:7
**professionals (3)**
28:23;34:8;73:24
**profit (5)**
71:7,17,18;72:4;
76:23
**profitable (4)**
42:8,10,14,14
**progressed (2)**
22:6,16
**proper (1)**
11:25
**property (29)**
36:2;45:6,21,24;
46:2;56:18;57:5,7,16;
58:3;59:3,15;60:6,8,
12,12,13,19;61:8,12,
16,22;62:2,5;65:6,19;
68:9;75:19;76:4
**prospect (1)**
54:3
**prove (1)**
10:15
**provide (9)**
5:12;28:6,7,8;36:7;
53:25;64:1;71:6;
77:12
**provided (8)**
6:14;10:23;19:11;
22:20;27:18;60:7,15;
69:23
**providing (6)**
4:9;16:6,8;35:1,6;
72:7
**provision (1)**
63:22
**public (3)**
10:23;11:22;19:8
**pulled (1)**
75:7
**purchase (8)**
57:8,16;58:9,25;
59:3,10,12,13
**purpose (1)**
56:3
**purposes (1)**
48:9
**pursuant (1)**
2:8
**put (13)**
4:5;12:5;22:12;
23:10,12,15;38:3;
39:13;44:18;62:9;
64:20;74:16;76:3
**putting (1)**
24:8

---

## Q

**quick (3)**
20:23;33:4;65:10

22-40065-jpg    Doc 69-1    FILED 03/14/22    ENTERED 03/14/22 16:35:04    Page 87 of 91

**quickly (5)**
38:1;44:13;47:9;
66:3,9
**quite (10)**
12:18;13:22;17:13;
19:5;30:4;31:24;
47:15;53:8;61:18;
65:10

**R**

**raid (1)**
33:6
**raise (1)**
3:25
**ran (1)**
11:24
**rather (1)**
66:7
**reach (2)**
20:25;54:2
**real (7)**
23:10;47:9;57:1,3;
62:13;67:25;68:1
**realized (1)**
20:22
**really (13)**
8:22;12:4;20:6,14;
22:9;24:16;29:1,24;
41:24;42:1;54:16;
75:24,25
**reason (2)**
22:25;47:14
**reasons (5)**
10:4;12:3;23:15,23;
25:13
**recall (3)**
4:23;36:3;57:9
**receivable (5)**
40:10,20;42:17,25;
45:5
**receivables (1)**
52:4
**receive (5)**
5:19;8:5;39:10;
62:16;76:16
**received (3)**
40:6;74:2;75:11
**receiving (2)**
8:10;68:12
**recently (3)**
9:6;39:10;46:3
**receptive (1)**
49:4
**reconvene (1)**
76:19
**record (4)**
20:24;22:19;53:20,
22
**recorded (1)**
3:2
**records (3)**
31:17,19;70:11

**Recovery (5)**
2:3;47:17,19;48:5;
73:8
**recreational (1)**
59:20
**referenced (1)**
55:5
**reflect (1)**
7:1
**Regarding (8)**
5:20;6:2,11;56:25;
63:18;64:12;73:19;
74:7
**regards (1)**
7:11
**Region (2)**
2:10,10
**registers (1)**
76:25
**re-inspect (2)**
9:11,14
**re-inspection (1)**
37:10
**reinstated (1)**
37:2
**relate (1)**
39:16
**related (3)**
48:2;61:16,21
**relating (1)**
54:4
**relationship (4)**
13:20;48:6,7;58:16
**released (3)**
9:22;12:1,6
**relief (2)**
52:19;65:4
**remember (1)**
53:18
**reminder (1)**
75:1
**rent (7)**
34:16;35:15,16;
44:10;57:20;61:4,7
**reopen (2)**
16:5;64:25
**reorganization (3)**
64:13;65:25;66:25
**reorganize (2)**
65:7,19
**repeat (1)**
61:17
**repeating (1)**
64:22
**rephrase (1)**
42:13
**report (4)**
74:7,11,19;75:2
**represent (4)**
3:17;35:24,25;
40:20
**representative (2)**
3:9;73:18

**representing (1)**
38:13
**request (1)**
72:10
**requested (4)**
71:7;75:10;76:17;
77:4
**require (1)**
7:6
**required (4)**
11:2;14:13;57:25;
61:20
**requirement (1)**
48:24
**requires (1)**
9:12
**re-route (1)**
50:21
**residential (1)**
28:7
**respect (2)**
54:3;66:24
**Respectfully (1)**
65:8
**respond (1)**
11:6
**responses (1)**
10:13
**responsible (1)**
58:12
**restrictions (1)**
3:1
**retain (4)**
38:24;67:5;72:10;
74:22
**retained (2)**
72:19,20
**retainer (1)**
73:4
**retention (1)**
73:1
**return (2)**
70:16;71:1
**returned (1)**
10:9
**returns (1)**
70:14
**revenue (5)**
41:5,8;43:22;44:2,5
**revenues (2)**
13:7;44:10
**reverse (2)**
11:10,14
**reversed (1)**
16:5
**review (2)**
6:18;76:17
**reviewing (4)**
22:3;67:23;73:11,
14
**revised (1)**
36:13
**revisit (1)**

69:2
**revocation (2)**
10:19;37:9
**revoked (2)**
9:6,9
**right (22)**
4:1;8:5,25;11:9,10;
14:14;15:19;16:1;
23:20;31:2;44:4;
47:11;51:24;52:12;
57:24;58:6;60:20;
66:14;67:7,13;73:10;
74:1
**rights (2)**
13:12;20:19
**RNs (1)**
28:15
**road (2)**
11:24;58:9
**role (1)**
28:17
**room (2)**
39:24;41:12
**rooms (3)**
32:18;33:1;44:10
**roughly (2)**
21:14;49:9
**Rucci (3)**
3:9,25;4:3,4,7,12;
24:23;27:4
**R-U-C-C-I (1)**
4:12
**run (1)**
47:13
**running (3)**
5:5;21:8;48:1
**rush (1)**
43:17

**S**

**safe (1)**
52:1
**sake (2)**
24:24;25:11
**salary (4)**
8:4,14,16;68:11
**sale (2)**
63:19,22
**Sam (1)**
33:24
**same (10)**
5:6,6;6:11;15:1,23;
26:21;56:2;58:4;
59:16;60:17
**saying (5)**
14:16;49:17;53:11,
19;67:19
**Schedule (3)**
40:16;45:17;62:1
**scheduled (1)**
19:23
**schedules (7)**

5:13,16,23;6:7,16,
19;7:5
**SCHOENEWALD (34)**
2:1,11;3:11,16,20;
4:5,8;17:2;31:22;
35:12;38:8;39:6;40:5;
44:15;48:15;49:22;
51:17;54:22;56:16;
59:14;64:7;66:11;
68:7;70:21;71:12;
72:2,22;74:21;75:9;
76:9,14;77:7,12,15
**Schwieg (6)**
3:14,14;75:12,14,
18;76:7
**se (2)**
28:1;43:11
**Sebastian (4)**
3:9;4:4,7,11
**S-E-B-A-S-T-I-A-N (1)**
4:11
**second (9)**
7:13,25;13:1;46:9;
54:7,9,19;58:5;70:3
**Section (1)**
2:9
**secure (3)**
16:3,3;60:21
**secured (2)**
30:12,15
**security (1)**
16:18
**seem (2)**
49:4;67:14
**seems (1)**
54:16
**seize (1)**
47:23
**seized (4)**
7:9,16;8:11;21:24
**seizing (1)**
24:18
**seizure (10)**
9:24;10:18;11:1;
23:18;25:6;34:12;
37:11;46:18;47:11;
64:23
**self-funding (2)**
64:8,11
**sell (1)**
66:12
**send (4)**
36:8;71:9,11,17
**sent (1)**
71:18
**sentences (1)**
11:16
**separately (1)**
60:4
**service (1)**
30:6
**services (12)**
16:6;27:17;38:16,

24;39:17,23;59:17;
60:7,15;69:23;70:22;
73:8
**set (1)**
35:18
**settle (2)**
19:21;20:9
**settlement (1)**
19:16
**seven (1)**
12:17
**shareholder (4)**
4:14;13:11,13,15
**short (6)**
22:17;25:1;27:16;
28:2;37:7;64:13
**shot (1)**
66:3
**show (4)**
10:20;11:5,16;24:6
**shown (2)**
10:12;19:5
**sign (1)**
48:23
**signatory (2)**
46:24;48:16
**signature (4)**
5:16,22;6:2,6
**signed (7)**
6:9,20;24:1;31:20;
50:25;51:9;58:22
**sister (1)**
47:1
**sit (2)**
12:9;49:18
**site (3)**
13:4;21:21;29:3
**sitting (2)**
44:3;72:14
**six (3)**
25:23;42:22;47:16
**size (1)**
12:20
**slow (1)**
43:3
**sober (3)**
33:11,17,22
**sold (1)**
68:20
**sole (4)**
4:14;27:10;58:11,
13
**solely (1)**
48:9
**solve (1)**
12:24
**somebody (5)**
16:17;38:4;53:9;
56:4,5
**Sometimes (1)**
50:13
**somewhere (2)**
57:13;59:2

**soon (3)**
38:3;74:8,16
**sorry (35)**
24:23;25:10,12;
31:16;33:13;34:19,
23;35:20;39:24;
40:19;41:16,17;42:5;
45:21;46:24;51:23;
52:5;53:4,4;54:4,20;
56:22;57:9;58:6,6,20,
23;60:24,63:22;64:6;
66:24;71:4;75:22;
76:9;77:11
**sort (2)**
34:17;61:4
**sorts (2)**
15:21;45:6
**source (2)**
44:1;73:4
**Southeastern (1)**
45:17
**speak (1)**
73:17
**speaking (1)**
58:14
**special (1)**
67:5
**specific (1)**
68:15
**spectrums (1)**
27:24
**spending (1)**
11:19
**spent (1)**
62:8
**spouse (1)**
26:23
**staff (4)**
21:11;28:24;34:8,
12
**stall (1)**
65:23
**stand (2)**
11:23;20:6
**standing (1)**
18:22
**start (4)**
4:9;9:2;29:16;
54:15
**started (5)**
4:20;28:4;29:21;
39:5;54:7
**starting (2)**
3:12;29:19
**State (15)**
9:11,19,21;12:21;
18:22;21:13;23:4;
28:18;37:13;41:14,
21;65:11,16;70:13;
77:5
**Statement (1)**
5:16,23;6:7,16,19;
7:5;33:10;41:2;72:4;

76:24
**statements (5)**
33:14;71:8,17,18;
76:24
**States (8)**
2:4,8,9,12,15,17;
73:18;76:22
**state's (1)**
41:22
**stay (6)**
17:7;21:16;22:1,9;
46:9;65:4
**stayed (1)**
34:15
**staying (1)**
34:14
**step (4)**
28:3,19;52:20,21
**stepping (1)**
28:20
**steps (1)**
36:25
**Steve (1)**
38:12
**stick (1)**
15:25
**still (27)**
12:23;15:7,9;16:17,
18;19:11;20:17;
23:12;25:5;27:8;33:1;
39:22,23,24;40:14,24;
43:17;59:13;64:19;
65:19;70:10;74:23;
75:21,23,23;76:4;
77:10
**stop (2)**
8:10;60:16
**stored (1)**
30:4
**stories (1)**
54:20
**story (1)**
19:5
**straight (1)**
59:9
**strategically (1)**
23:22
**structured (1)**
33:21
**struggle (2)**
23:6,11
**stuck (1)**
16:15
**study (1)**
66:19
**stuff (8)**
22:25;31:12;47:23;
53:24;55:2;69:20;
71:4;74:14
**Subchapter (4)**
3:13,14,23;13:11
**submitted (1)**
73:12

**subpart (1)**
60:5
**substance (2)**
27:19;36:22
**substantial (3)**
8:23;20:3,11
**succeeded (1)**
19:14
**success (1)**
49:2
**successful (1)**
12:14
**suit (1)**
10:7
**summary (5)**
19:19;27:16;33:4;
44:20;64:13
**summer (1)**
64:19
**Summerfield (8)**
45:21;48:1;57:4,7;
62:2;63:6;65:21;
75:19
**supervised (1)**
28:12
**supervisors (1)**
28:13
**support (2)**
10:4;25:25
**Sure (20)**
4:11;7:25;8:3;
14:12;16:2;18:14;
22:10;27:19;31:24;
32:1;37:25;54:1,1,1;
63:21;64:6,14;69:12;
76:1;77:6
**suspend (1)**
31:6
**sworn (2)**
4:1,4
**Sympatico (1)**
40:4

## T

**talk (1)**
72:18
**talked (2)**
37:13,13
**talking (4)**
26:15;44:2,4;75:8
**tax (4)**
62:22;70:14,16;
71:1
**taxes (2)**
70:2,5
**Taylor (1)**
58:14
**technically (2)**
28:11;42:18
**telehealth (3)**
60:1,9,14
**telephonically (1)**

2:25
**temporarily (1)**
33:18
**temporary (1)**
18:16
**ten (4)**
17:6;41:11;43:17;
73:3
**tenants (1)**
61:2
**term (1)**
28:21
**terms (6)**
12:12;28:23;36:10;
45:13;57:6,25
**testified (1)**
67:4
**testimony (1)**
14:1
**thanks (1)**
14:24
**theoretically (1)**
44:8
**thinking (1)**
57:21
**third (3)**
13:1;21:21;54:7,9
**though (2)**
15:8;35:19
**thought (3)**
20:6;7;57:10
**thousand (7)**
41:1;42:22;49:15;
51:20;52:1;58:2;73:3
**three (11)**
8:21;12:8;24:11;
39:14;41:5;42:4,11;
46:22,24;60:20;61:3
**three- (1)**
55:23
**three-year (1)**
56:21
**throughout (2)**
29:13;73:19
**tied (1)**
23:19
**tile (1)**
59:11
**till (2)**
59:6;64:19
**title (1)**
4:13
**Today (10)**
2:19,24;9:1;22:16;
31:3;32:25;38:20;
76:21;77:4,17
**together (9)**
7:10;12:5;22:12;
23:11,13,16;24:9;
62:9;74:16
**told (3)**
47:6;54:12,13
**Tom (1)**

17:5
**tomorrow (1)**
7:14
**took (5)**
14:21;20:6;31:24;
41:9;50:25
**top (4)**
42:6;45:1;53:16;
57:8
**total (4)**
17:5;44:16,19;
57:16
**touched (2)**
18:25;64:15
**towards (3)**
23:19;57:18,20
**transfer (1)**
43:25
**transferred (1)**
68:20
**transfers (2)**
68:8,12
**treat (2)**
27:23,23
**treatment (1)**
27:20
**trial (4)**
2:11,14;19:20,24
**tried (2)**
42:1;47:15
**trumped (1)**
10:9
**Trustee (8)**
2:8,9,12,15,18;3:13,
15,23
**Trustee's (3)**
73:18;74:2;76:22
**try (7)**
12:5;20:8;22:3,11;
23:12;28:19;37:1
**trying (9)**
7:13;11:13;12:22;
20:1,3;23:2;43:16;
48:24,25
**Tuesday (1)**
29:12
**turn (1)**
40:17
**turned (1)**
32:23
**turning (1)**
41:2
**twice (5)**
26:13;28:16;29:7,
12;34:1
**two (17)**
7:7,12;9:9,24;
10:15;11:17;12:20;
41:6;45:24;46:21;
55:9,11;56:11,11,23;
62:17;69:8
**two-step (1)**
66:2

**two-year-old (2)**
11:3;37:9
**types (2)**
37:24;63:3

---

**U**

---

**Ultimately (5)**
20:9,18;24:3;26:4;
65:18
**unable (2)**
47:14;52:15
**uncashed (1)**
39:13
**under (6)**
6:23;13:11;19:18;
22:10;51:20;76:4
**undo (4)**
22:3,15;33:19;
64:25
**unfold (1)**
37:12
**unfolds (1)**
8:21
**unfortunate (1)**
27:21
**Unfortunately (4)**
11:25;24:7;25:8;
41:12
**unheard (1)**
25:6
**United (8)**
2:4,8,9,12,15,17;
73:18;76:22
**unless (2)**
24:25;77:16
**unsuccessfully (1)**
47:16
**unwind (1)**
64:24
**unwinding (1)**
64:24
**up (34)**
7:11,15;8:13;10:13;
11:7;12:10;13:14;
16:5;19:21;20:18;
23:5;32:16,16;35:18;
36:12;41:21;43:24;
47:12,14,17;48:4;
49:1,5;50:14;51:1;
53:9;54:24;56:21;
58:6;59:5,21;61:24;
65:15;75:7
**upcoming (1)**
9:21
**updated (1)**
9:5
**updates (2)**
7:8;58:15
**upped (1)**
40:25
**use (9)**
24:8;28:19;47:3;

49:24;50:2,3;70:22;
72:7;75:5
**used (13)**
6:15;8:5;9:23;10:2;
22:7;27:13;28:1;
49:23;56:1,3;62:3;
77:1,2
**using (3)**
18:15;46:17;51:15
**UST (1)**
76:22
**usually (1)**
15:2
**usury (1)**
19:15
**utilities (7)**
34:17;37:24;54:24;
55:2;61:5,23,24

---

**V**

---

**vacate (3)**
65:5,18;66:5
**vandalized (1)**
76:2
**Vara (1)**
2:10
**various (4)**
27:23;28:3;45:3,25
**vehicles (4)**
55:8,9;56:10,14
**verbal (1)**
34:25
**verify (1)**
5:15
**viable (3)**
15:9;19:7;24:14
**view (2)**
22:19;24:3
**violations (1)**
21:15
**visits (1)**
34:5
**Vitullo (8)**
3:7,7;38:10,15;
69:7;73:1,12;75:3
**volunteer (2)**
16:16,16
**volunteered (1)**
31:20
**volunteering (2)**
17:4;35:10
**volunteers (13)**
15:19,21;16:1,11;
17:24;18:2,12,17;
33:15;34:7;35:7;56:9,
10

---

**W**

---

**wait (1)**
54:19
**waiting (2)**

15:19;35:10
**waiver (1)**
76:23
**waivers (1)**
31:21
**walked (1)**
36:25
**warrant (1)**
24:1
**warrants (1)**
22:4
**water (1)**
61:24
**way (16)**
13:19;15:17;18:3;
20:2;37:3,3,7,22;
42:10;43:5;45:4;
50:12;65:13;66:19;
74:13;76:18
**ways (2)**
16:1;56:22
**Weaver (2)**
2:16;71:19
**website (1)**
75:5
**week (12)**
8:6,8,10;21:22;
28:16;29:4,7,12,13;
34:1;54:7,9
**weeks (6)**
12:8;25:17,23;
29:22;39:14;47:16
**welcome (1)**
76:12
**Wells (1)**
53:17
**weren't (2)**
22:5;67:22
**what's (7)**
9:14;10:7;13:13;
30:5;31:25;57:13;
59:2
**whenever (1)**
14:12
**whole (5)**
10:16;11:12;26:21;
37:11;44:11
**who's (2)**
48:2;58:12
**willing (1)**
73:17
**Winter (2)**
43:9,10
**wire (1)**
20:20
**wish (1)**
46:10
**within (7)**
12:8;20:24;22:17;
37:7,17;65:13;68:16
**without (5)**
10:25;11:1;37:9,10;
64:21

**witness (4)**
3:5;4:4;35:8;77:6
**witnesses (1)**
9:18
**woods (1)**
59:24
**word (1)**
64:3
**work (15)**
5:2,9;17:6;28:17;
35:5;38:14,20;40:22;
42:20;45:20;49:25;
56:5;67:9,20,22
**worked (1)**
21:3
**workers' (2)**
63:9,11
**working (5)**
15:7,8;29:25;34:11;
50:12
**works (1)**
52:20
**wrap (1)**
65:15
**wrapped (2)**
7:15;23:5
**write (1)**
49:25
**writing (1)**
67:24
**written (1)**
36:4
**wrong (2)**
52:18;57:15
**wrongfully (1)**
47:22
**wrote (2)**
39:1;51:11

---

**Y**

---

**year (14)**
21:14;36:12;39:23;
42:8,9,9,12,15;43:4,8,
10;55:24;56:23;72:17
**years (13)**
4:17;9:10;10:15;
11:17;13:25;26:25;
27:5,9;41:5;42:4,11;
45:24;46:17
**yesterday (1)**
64:16

---

**Z**

---

**Zero (2)**
46:16;66:10

---

**1**

---

**10 (1)**
2:24
**10,000 (2)**

36:11;39:4
**10:00 (1)**
2:24
**100 (2)**
13:15;42:2
**100,000 (1)**
52:6
**11 (2)**
2:2;40:16
**110 (2)**
12:19;42:2
**12 (6)**
60:11,13,15;68:9,
13,14
**16 (1)**
74:4
**16th (1)**
22:24
**18 (1)**
12:4
**19 (1)**
42:15
**1st (2)**
4:21;29:21

### 2

**20 (1)**
41:11
**200 (1)**
41:20
**200,000 (1)**
40:12
**2017 (6)**
4:18,20,21;18:19;
29:15,17
**2019 (1)**
55:12
**2020 (3)**
41:6;42:13;55:12
**2021 (11)**
12:13;17:18,22;
41:7;42:12,14;58:8,
20;70:16;72:4;76:25
**2021s (1)**
70:17
**2022 (5)**
2:4,24;7:18;42:12;
77:1
**21st (1)**
75:4
**22-CV0057 (1)**
8:1
**23rd (1)**
7:18
**24/7 (2)**
16:18;29:5
**25 (1)**
11:16
**26 (1)**
13:7
**28th (2)**
37:14;60:17

**29th (4)**
33:9;36:15,19;
39:18

### 3

**3.1 (1)**
44:23
**30 (2)**
2:4;21:25
**300,000 (3)**
57:11,14,15
**30th (2)**
23:14;58:7
**31st (1)**
77:1
**32 (1)**
26:25
**341 (1)**
77:19
**341a (1)**
2:9
**360,000 (1)**
59:2

### 4

**40 (1)**
57:21
**400,000 (1)**
59:1
**401ks (1)**
63:15
**41g (3)**
10:8,9;39:8
**49862 (1)**
58:9

### 5

**5,000 (2)**
57:12;59:1
**5/14 (1)**
58:8
**50 (5)**
10:23;12:16;17:17;
21:10;36:12
**50,000 (1)**
57:22
**500,000 (2)**
20:20;42:21
**5th (4)**
8:12;10:1;21:24;
31:25

### 6

**6 (1)**
7:19
**60 (8)**
37:7,17;38:6;59:22;
65:13;70:9,25;71:1
**60- (1)**

37:20
**600,000 (1)**
68:2
**60-day (1)**
67:1

### 7

**77 (1)**
62:1

### 8

**80 (1)**
59:20

### 9

**9 (1)**
2:10
**90 (2)**
52:2;68:16